**Sydney O. HALL, Appellant,**

v.

**Claude A. FORD, et al.**

No. 87–7138.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 26, 1988.

Decided Aug. 26, 1988.

Stanley A. Freeman, with whom Peter S. Leyton, Washington, D.C., was on the brief, for appellant.

Donna M. Murasky, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, and SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Sydney O. Hall appeals from the district court's dismissal of his complaint for failure to state a claim. Hall was terminated as the Athletic Director of the University of the District of Columbia. He claims that he was fired, in violation of the First Amendment, because of his criticisms of improprieties within the Athletic Department. He also argues that his termination violated the Due Process Clause and his rights under District of Columbia law. We affirm the district court's conclusion that the termination was lawful.

## I. BACKGROUND

Our recitation of the factual background is based on the allegations of the complaint. As the district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we must assume these allegations to be true.

Plaintiff/appellant Hall is a tenured faculty member of the University of the District of Columbia ("UDC"). In late 1983, then-President Green asked appellant to become the UDC's Athletic Director and to "bring the UDC Athletic Department into full compliance with [National Collegiate Athletic Association ("NCAA")] and UDC rules and guidelines." Complaint at ¶ 10, Appendix ("App.") at 3–4. Green allegedly promised Hall that Green "would support those steps [appellant] found necessary to bring the Athletic Department into compliance...." Complaint at ¶ 11, App. at 4. Appellant accepted the appointment and served as Athletic Director until he was terminated effective December 31, 1985.

Appellant claims that he was terminated because his "public and private" statements, Complaint at ¶ 21, App. at 6, concerning the Athletic Department's deficiencies made him unpopular with the UDC Board of Trustees. The complaint also alleges:

13. During his employment as UDC Athletic Director, the [appellant] publicly voiced his concerns about, and acted to investigate and, where necessary, to remedy, possible violations of NCAA and UDC rules and guidelines involving, among other things: ineligible athletes playing on UDC athletic teams; the improper authorization of an athletic scholarship to an ineligible athlete; the changing of student grades by University employees for purposes of maintaining athletic eligibility; the use of drugs by student athletes; and the violation of rules prohibiting athletic practices at unauthorized times and places.

14. [Appellant's] efforts to investigate and to remedy possible NCAA and UDC rule and guideline violations were opposed with increasing frequency by the UDC administration and various members of the Board.

....

17. On or about December 9, 1985, [appellant] was directed to resign from his position as Athletic Director by Claude A. Ford, UDC President....

18. President Ford admitted that [appellant] was terminated because of pressure from the Board and not because of deficient performance. Indeed, President Ford acknowledged that his decision to terminate [appellant] "does not reflect unfavorably on your performance as Athletic Director ... [and] the University is most grateful for your work in solidifying the management controls in the Department."

App. at 4–6 (last ellipsis original). Hall claims that these statements, protected by the First Amendment, were a substantial or motivating factor in his discharge. Complaint at ¶¶ 20–21, App. at 6.

Appellant further alleges that the termination without cause and without a hearing deprived him of his right to due process to protect his property interest in continued employment and his liberty interest in his reputation. He also includes a number of pendent claims. First, and related to the

due process claim, he argues that the discharge constituted a breach of contract of employment, under which he would only be terminated for cause. He likewise maintains that this promise of termination only for cause gave him a claim for promissory estoppel.

Hall's final pendent claims are for defamation and wrongful termination. The defamation claim is based on a memorandum sent by Mary W. Colvin, the UDC Treasurer, to the UDC Controller ("Colvin memorandum"). The memorandum, which concerned the handling of funds from a tennis tournament, contained the following statement:

> The Controller was not informed of the event nor the deviation of [sic] the collection process. *This is not the first time that the office of the Cashier has called malfeasance to the attention of the Athletic Director*, e.g.; The Strawberry Festivals and other tournaments, uncontrolled ticket sales, discrepancies over renting the gymnasium facility, pricing and collection authority.

App. at 14 (emphasis added). The record does not indicate whether the prior incidents referred to occurred during Hall's tenure as Athletic Director.

Appellant's claim for wrongful termination is based on D.C. public policy protecting the unfettered discussion of public issues by District employees. Even though he admits that as an "excepted service" employee under District of Columbia law he had no statutory right to termination only for cause, appellant contends that he could not be terminated, as he was in this case, for reasons that contravene that policy.

## II. DISCUSSION

We review a dismissal for failure to state a claim de novo, for the dismissal reflects the district court's purely legal conclusion that the facts alleged do not establish a valid cause of action.

### A. First Amendment

■ Appellant's First Amendment claim is governed by *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its offspring. As later elaborated by the Supreme Court, the *Pickering* cause of action has four elements. First, the public employee must have been speaking on a matter of public concern. If the speech is not of public concern, "it is unnecessary ... to scrutinize the reasons for [the] discharge," *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), at least "absent the most unusual circumstances." *Id.* at 147, 103 S.Ct. at 1690. Second, the court must "balance" the interests of the employee, "as a citizen, in commenting upon matters of public interest and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. Third, the employee must prove that his speech was a substantial or motivating factor in his discharge. *Mount Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct. *Id.*

The first two inquiries are questions of law for the court to resolve. *See, e.g., Connick*, 461 U.S. at 148 n. 7 & 150 n. 10, 103 S.Ct. at 1690, n. 7 & 1692 n. 10; *Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987). The latter two are questions of fact ordinarily left to the jury. *See, e.g., Jett v. Dallas Indep. School Dist.*, 798 F.2d 748, 758 (5th Cir.1986).

■ Appellees argued to the district court that appellant had failed to demonstrate causation, the third factor. Appellees maintained that the speech that Hall alleged led to his dismissal occurred before Ford became President, and therefore could not conceivably have led to his termination by Ford. On a motion to dismiss, however, we take as true plaintiff's factual allegations, to wit, that he "was terminated because of pressure from the Board," Complaint at ¶ 18, App. at 6, and that various Board members disliked him because of his

criticism of the athletic program. Complaint at ¶ 14, App. at 5.

■ We also reject appellees' suggestion that under D.C. law governing employment of "excepted service" executives, UDC could dismiss at will employees, such as appellant, even for protected First Amendment activity:

It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. Even though McPherson was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression.

*Rankin v. McPherson*, —— U.S. ——, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (citations omitted). As we discuss below at 264–65, however, appellant's excepted service classification is relevant to our conclusion that he was a high-level employee who could be dismissed for speech concerning policy matters relating to his job responsibilities.

We turn now to the first two prongs of the *Pickering* test, upon which the district court primarily relied. We disagree with the district court's view that Hall's speech was not of public concern, but affirm its conclusion that the government's interest in efficient administration outweighed Hall's interest in speaking.

### 1. Public Concern

The *Pickering* balance applies only if the employee's speech relates to a matter of public concern, i.e., "of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. Public concern is "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690–91. The "public concern" test has been summarized as follows:

Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. On the other hand, speech that concerns "issues about which information is needed or appropriate to enable members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983) (citations omitted).

■ As noted above, appellant spoke about various violations of NCAA and UDC rules. Complaint at ¶ 13, App. at 4. Although the complaint does not specify the precise content of the statements, nor indicate the form or context in which they were made, it nevertheless establishes that appellant's speech addressed a matter of public concern. A substantial segment of the general public would be interested in violations of athletic rules, which would reveal whether the current university administration is mismanaging the athletic program.

The Supreme Court has indicated that a public employee's comments on the structure of academic and athletic programs are of public concern. In *Pickering*, a teacher wrote a letter to a newspaper concerning the school board's allocation of funds between athletic and educational programs, and its withholding of information from the public about the uses it planned to make of new tax revenues. The Court found the subject to be "a matter of legitimate public concern." 391 U.S. at 569–72, 88 S.Ct. at 1735–37. *See also Perry v. Sindermann*, 408 U.S. 593, 594–95, 598, 92 S.Ct. 2694, 2696, 2698, 33 L.Ed.2d 570 (1972).

*Jett v. Dallas Independent School District*, 798 F.2d 748 (5th Cir.1986), is particularly on point. A high school football coach was quoted in a newspaper as stating that few of his players could meet proposed NCAA academic eligibility requirements. "This remark, which concerns the academic development of public high school football players and their potential

eligibility for playing college football, certainly addresses matters of concern to the community." 798 F.2d at 758. *See also Anderson v. Central Point School Dist. No. 6,* 746 F.2d 505 (9th Cir.1984) (assistant football coach's statements concerning restructuring of athletic program were of public concern); *McGee v. South Pemiscot School Dist. R–V,* 712 F.2d 339, 342 (8th Cir.1983) (coach's letter supporting junior high track was of public concern, given community's interest in the subject).

Appellees attempt to characterize this as an "employee grievance" case, relying on *Connick.* In that case, an assistant district attorney who had been transferred against her will circulated within the office a questionnaire concerning the transfer policy, morale, confidence in superiors, and pressure to work in political campaigns. Except for the question concerning campaigning, the questions were not of public concern, but were "mere extensions of [the employee's] dispute over her transfer." 461 U.S. at 148, 103 S.Ct. at 1690. "Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Id. See also Murray v. Gardner,* 741 F.2d 434, 438 (D.C.Cir.1984) (employee's complaints about FBI's furlough plan were "an example of the quintessential employee beef: management has acted incompetently.... But the furlough plan was purely a labor relations matter," and not of general public concern), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985).

Appellees argue that appellant "engaged only in job-related speech." Brief for Appellees at 38. As there was no dispute between Hall and the Board or the President over the goal of bringing the athletic program into compliance with NCAA and UDC rules, the only dispute "was over *how* the University's policy of seeking compliance with athletic guidelines was to be implemented." *Id.* at 40 (emphasis original). The dispute over the intermediate steps, say appellees, was an employee grievance, not a matter of public concern.

Even if Hall's statements reflected his job-related disagreements with his superiors, they are still of public concern. True, a matter is not of public concern *merely* because it grows out of a disagreement between government officials. *See Barnes v. Small,* 840 F.2d 972, 983 (D.C.Cir.1988). But neither does a topic otherwise of public concern *lose* its importance merely because it arises in an employee dispute. *See, e.g., Rode v. Dellarciprete,* 845 F.2d 1195, 1201–02 (3d Cir.1988); *Gonzales v. Benavides,* 774 F.2d 1295, 1300–01 (5th Cir.1985) (*Connick* does not "exclude the possibility that an issue of private concern to the employee may also be an issue of public concern."), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986). As we conclude Hall's speech was of public concern, we must now consider whether the government's interest outweighed Hall's interest in speaking.

### 2. *Government Interest*

The Supreme Court recently summarized the elements of government interest that are to be weighed against the employee's interest in speech:

> We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.
>
> These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise.

*Rankin,* 107 S.Ct. at 2899 (citation omitted).

Appellant argues that the district court prematurely dismissed the complaint under the government interest prong because the government failed to make "an objective showing of concrete harm" to the effective functioning of the government enterprise.

Brief for Appellant at 8. The complaint, to which the district court was limited under Rule 12(b)(6), contained no such evidence. The complaint did not allege, for example, that Hall's speech disrupted an intimate, day-to-day relationship between Hall and the Board of Trustees or the President. *Cf. Rankin,* 107 S.Ct. at 2899. Appellant argues that absent objective evidence of concrete harm, the district court's conclusion necessarily was premised on speculation that Hall's speech would damage the government's interest in efficient operation. He maintains that such speculation contravened the clear dictate of *Rankin,* 107 S.Ct. at 2899, and *American Postal Workers Union v. United States Postal Service,* 830 F.2d 294, 303–04 & n. 12 (D.C. Cir.1987) ("*APWU*").

Although unadorned speculation as to the impact of speech, whether public or private, on the government's enterprise will not suffice under *Rankin* and *APWU,* neither case forbids us from drawing reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior. *Connick,* for example, recognized that the employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." 461 U.S. at 152, 103 S.Ct. at 1692–93. Just as the employer may be permitted to infer these untoward consequences from the content, manner, time, and place of the employee's speech, so may we. *Id.* at 151–53, 103 S.Ct. at 1692–93. Moreover, *Rankin* indicates that the higher the level the employee occupies, the less stringent the government's burden of proving interference with its interest:

> The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no *confidential, policymaking, or public contact role,* the danger to the agency's successful function from that employee's private speech is minimal.

107 S.Ct. at 2900 (emphasis added).

The present case requires us to explore this evolving area of constitutional law:

balancing the government's interest against the First Amendment rights of high-level employees. The Supreme Court has not explicitly addressed the balance in cases involving *speech* by such employees, but it has applied an analogous balancing test in cases involving political affiliation, prohibiting patronage dismissals except for certain high-level employees (sometimes described as "policymakers"). Although not directly applicable, the patronage cases address similar concerns and recognize a government interest that is apposite here.

### a. *Principles of Political Affiliation Cases*

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), various ministerial employees of the Sheriff's office (e.g., process servers and bailiffs) were fired by a newly elected Democratic Sheriff because they were Republicans. The Court held that the dismissals were barred by the First Amendment. The three-member plurality thought patronage dismissals impaired freedom of belief and association and damaged the electoral process. The plurality admitted that the government had a legitimate interest in ensuring "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration...." 427 U.S. at 367, 96 S.Ct. at 2686. This interest could be met, according to the plurality, by "[l]imiting patronage dismissals to policymaking positions." *Id.* Courts could determine whether an employee occupies a policymaking position by examining the nature of his responsibilities, particularly whether the employee "acts as an adviser or formulates plans for the implementation of broad goals." *Id.* at 368, 96 S.Ct. at 2687. Two members concurred on the ground that "a nonpolicymaking, nonconfidential government employee" could not be discharged for political belief. *Id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring).

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), assistant public defenders were dismissed by a new-

ly appointed Democratic Public Defender because they were Republicans. The Court followed *Elrod*'s holding that party affiliation is usually an illegitimate basis for dismissal, but qualified its definition of the exception to the general rule:

> the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of · the public office involved.

445 U.S. at 518, 100 S.Ct. at 1295. The Court gave one example of a position for which affiliation is an appropriate requirement:

> [T]he Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.

*Id.* The Court concluded that although the work of assistant public defenders was confidential and policymaking in one sense, party affiliation was irrelevant to the effective performance of their jobs.

The First Circuit, after surveying the lower courts that have interpreted *Elrod* and *Branti*, distilled a two-part test for determining whether an employee may be dismissed because of political affiliation. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir.1986) (en banc), *cert. denied*, — U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). First, and as a threshold matter, it asks whether the position

> relates to "partisan political interests.... [or] concerns." [*Branti,*] 445 U.S. at 519 [100 S.Ct. at 1295]. That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation?

*Id. See also Shondel v. McDermott*, 775 F.2d 859, 864 (7th Cir.1985) (employee may be dismissed for affiliation if his job per-

formance "has a political dimension in the sense that it cannot be evaluated solely on the basis of neutral, apolitical criteria of professional competence"); *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981) (does position involve "government decision-making on issues where there is room for principled disagreement on goals or their implementation"?), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

Second, *Jimenez Fuentes* directs us to "examine the particular responsibilities of the position to determine whether it resembles a policymaker...." 807 F.2d at 242. Even though, after *Branti*, "policymaker" carries no talismanic significance, it remains a convenient shorthand for the type of employee for whom political affiliation is an appropriate requirement. 807 F.2d at 240; *see also Brown v. Trench*, 787 F.2d 167, 168–69 (3d Cir.1986); *Grossart v. Dinaso*, 758 F.2d 1221, 1227 n. 4 (7th Cir. 1985). We must focus on the powers inherent in the office, even if a particular incumbent has not exercised all of his authority. *Jimenez Fuentes*, 807 F.2d at 242. Among the relevant indicia of policymaking authority are vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders. *Id. (quoting Ecker v. Cohalan*, 542 F.Supp. 896, 901 (E.D.N.Y.1982), and *Elrod*, 427 U.S. at 368, 96 S.Ct. at 2687). *See also Brown*, 787 F.2d at 169–70.

### b. *Relevance to Employee Speech Cases*

◼ The *Elrod–Branti* line is premised upon concerns similar to those animating the employee speech cases. The *Elrod* plurality, 427 U.S. at 359, 96 S.Ct. at 2682, relied upon *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a *Pickering* case. As a general rule, the government cannot condition employment on the compromise or relinquishment of a constitutional right, be it freedom of belief

and association (*Elrod*), or freedom of speech (*Pickering*).

Both *Elrod–Branti* and *Pickering* limit this principle by recognizing that government has a legitimate interest in efficient operations. The exception for patronage dismissals of certain employees reflects the importance of allowing officials at the top of the organizational hierarchy to implement their policies through politically compatible deputies.

> In order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance.

*Jimenez Fuentes,* 807 F.2d at 241; *see also Elrod,* 427 U.S. at 367, 96 S.Ct. at 2686; *Grossart,* 758 F.2d at 1226 ("Elected officials must be able to rely on the political loyalty of a policymaking civil servant in order to seize the reigns [sic] of government and realize their electoral mandate.").

The same concern for the success of a government program is reflected in the government interest prong of the *Pickering* test, which "focuses on the effective functioning of the public employer's enterprise." *Rankin,* 107 S.Ct. at 2899. Both *Elrod* and *Pickering* balance this government interest against the employee's interest in the exercise of constitutional rights.

Given the similarity in the bases and countervailing interests recognized in *Pickering* and *Elrod–Branti,* the government interest recognized in the affiliation cases is also relevant in the employee speech cases. As the Fifth Circuit noted,

> reasoning that permits the President to terminate a Deputy Secretary of Defense because he is a member of the opposition party but prohibits him from firing the Deputy for a public expression of policy contrary to his own suffers for lack of defining principle. . . . Government has an interest in conceding to elected offi-

cials the power to implement policy for which they must answer to the voters. In more familiar language, knowing that the buck stops, and where, is a substantial government interest.

*Gonzalez v. Benavides,* 712 F.2d 142, 148 (5th Cir.1983) ("*Gonzalez I*"), *after remand,* 774 F.2d 1295 (5th Cir.1985) ("*Gonzalez II*"), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986). Stated differently,

> [t]here is a governmental interest in securing those unique relationships between certain high level executives and the elected officials at whose grace they serve. For this narrow band of relationships, refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself. . . .

*Gonzalez I,* 712 F.2d at 148.

The reason is self-evident. High-level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superiors' policies, and perceived by the public as sharing their superiors' aims; this is true whether or not those officials are elected. In the case of key patronage appointments, this government interest is protected because of the presumption that these individuals are compatible with the elected officials they serve. As they belong to the same party, they may be presumed to share common interests and goals, which cannot be said of members of an opposition party. But regardless of whether a key policy level deputy is appointed from among the ranks of party members, the need for compatibility remains.

■ The affiliation cases arise in a discrete context—the unique role of parties in elective politics, the hurlyburly of elections and their aftermath—and the vocabulary of these cases reflects this context. Although the interests recognized in these cases provide a helpful insight into the employee speech cases, the nomenclature is more confusing than illuminating when transferred. Thus, while we adopt the criteria set forth in *Jimenez Fuentes* as a means of

identifying those high-level employees for whom compatibility with superiors is crucial, we modify its terminology by substituting "policy" for "partisan" and "political." We will ask first whether the employee's position relates to an area as to which there is room for principled disagreement on goals or their implementation. *See Nekolny*, 653 F.2d at 1170. In other words, is it a *policy* area? If so, we then ask whether the office gives the employee broad responsibilities with respect to policy formulation, implementation, or enunciation. Put differently, was the individual a *policy level* employee? If both criteria are met, we ask whether the government interest in accomplishing its organizational objectives through compatible policy level deputies is implicated by the employee's speech. *See Gonzalez II*, 774 F.2d at 1302. At a minimum, the employee's speech must relate to policy areas for which he is responsible.

### c. *Application to Present Case*

▮ Did Hall and the Board fall "into that narrow band of fragile relationships requiring for job security loyalty at the expense of unfettered speech"? *Gonzalez I*, 712 F.2d at 150. The district court rightly concluded that they did, and therefore that the government's interest in the effective functioning of its enterprise outweighed Hall's interest in speaking on a matter of public concern.

Hall's position related to a policy area, and his duties were such as to identify him as a prominent policy level official. The University therefore had a significant interest in ensuring that Hall was, and was perceived to be, compatible with the President and the Board. Hall's speech directly interfered with this interest, as he engaged in a pattern of opposition to the policies of his superiors.

First, the Athletic Directorship clearly is a position that relates to policy concerns. There is substantial room for principled disagreement on the formulation and implementation of goals for the Athletic Department. Two directors may disagree about which sports to emphasize, whether to focus on league or intramural activities, or whether to insist on compliance with NCAA and University rules even at the expense of negative publicity and competitive setbacks. As the Athletic Director's job performance cannot be measured solely on the basis of neutral, technical criteria of professional competence, his position relates to a policy area. *See Shondel*, 775 F.2d at 864; *cf. Roman Melendez v. Inclan*, 826 F.2d 130, 133–34 (1st Cir.1987) (as physical condition of schools is matter of vital public concern, and there was room for disagreement as to priorities for investigating and remedying deficient conditions, position of director of program whose primary responsibility was to repair, maintain, and improve public schools clearly related to institutional policy); *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir.) (deputy water commissioner's duties related to unprotected area because there was room for principled disagreement on how best to accomplish goal of providing public services), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).

Second, Hall's duties as Athletic Director were sufficiently extensive to qualify him as a policy level employee. The Athletic Director is in the "excepted service," which is defined by statute as "an individual whose primary duties are of a policy determining, confidential, or policy advocacy character and who reports directly to the head of an agency." D.C.Code Ann. § 1–610.2 (1981). Although the statute is not conclusive, it is entitled to some deference. *Jimenez Fuentes*, 807 F.2d at 246. The statutory classification is confirmed by the complaint's description of the Athletic Directorship. Hall alleged that the President and the Board "placed the position of Athletic Director in the University's 'Excepted Service' so that the President could select the Athletic Director at his sole discretion." Complaint at ¶ 30, App. at 8. Hall was the President's key subordinate, chosen for the express purpose of implementing policy. The President "rel[ied] upon [appellant] to bring the UDC Athletic Department into full compliance with NCAA and UDC rules and guidelines." Complaint at ¶ 10, App. at 3. In other

words, he was charged with "formulat[ing] plans for the implementation of [the University's] broad goals." *Elrod*, 427 U.S. at 368, 96 S.Ct. at 2687 (plurality opinion).

These duties were obviously "not well defined [and] of broad scope." *Id.* Hall was the immediate subordinate of the President and the Board. He reported directly to them, and they were his only superiors. He had the power and primary responsibility to control all employees within his department. At the same time, he was a highly visible spokesman for the University's athletic program, likely to be thought of by the public as responsible for running the department.

Finally, the government's interest in having its Athletic Department efficiently operated in accordance with policies established by the President and Board was directly undermined by Hall's contrary views as to how these policies should have been formulated and implemented. He engaged in a pattern of speech concerning the proper response to rule violations within the department. Complaint at ¶ 13, App. at 4. His statements "were opposed with increasing frequency by the UDC administration and various members of the Board." Complaint at ¶ 14, App. at 5. Hall's views as to how the department should have been run were obviously at odds with those of the Board.

We conclude that Hall could be dismissed for expressing views on matters within the core of his responsibilities that reflected a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously.

**B. Due Process Clause**

**1. *Property Interest***

Appellant claims that his dismissal deprived him of his property interest in continued employment without due process. As property interests are " 'created and their dimensions are defined by ... state law,' " *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)),

Hall's property interest depends upon his claim of entitlement under D.C. law. It overlaps with his causes of action for breach of contract and promissory estoppel, and all three claims will be discussed here.

To determine whether Hall had a property interest in continued employment, we ask if he had a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that he would continue in his job. For example, a teacher had no property interest in employment when his term was to terminate on a certain date and no provision was made for renewal. *Roth*, 408 U.S. at 577–78, 92 S.Ct. at 2709–10. On the other hand, a teacher who was told, in an official faculty guide, that he could "feel that he ha[d] permanent tenure as long as his teaching services [were] satisfactory" had a legitimate expectation of continued employment. *Perry v. Sindermann*, 408 U.S. 593, 600–01, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972).

Most cases involving government employees fall into one of two categories: terminable at will or terminable only for cause. Those who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely. Those terminable only for cause, however, can expect to remain employed *unless* they do something warranting their termination.

Appellant admits that the Athletic Directorship was an "excepted service" position. Complaint at ¶ 30, App. at 8. Under District law, excepted service employees "do not have any job tenure or protection." D.C.Code Ann. § 1–610.5 (1981). *See also* 30 D.C.R. 1461 (1983) (regulation permits UDC Board to establish excepted service positions; such employees "shall serve at the pleasure of the President and may be terminated at any time"). Appellant admits that he signed an agreement that "he would 'serve at the pleasure of the President.' " Complaint at ¶ 32, App. at 9. This presumptively makes Hall an at-will employee with no legitimate expectation of

continued employment. *See Lyons v. Barrett*, 851 F.2d 406, 410 (D.C.Cir.1988) (employee who "served at the pleasure" of his superior lacked property interest in continued employment).

Appellant nevertheless claims he had a property interest in his job, for two reasons. First, he points to D.C. Code Ann. § 1–616.2(1) (1981), which gives D.C. employees the "right to freely express their opinions on all public issues." Hall does not claim that his termination violated the right codified in this statute. Rather, he asserts that because he could not be fired for speech (nor for the other reasons specified in D.C. Code Ann. § 1–616.2), he had a legitimate expectation of continued employment. Even if we assume that this statutory right limits terminations, Hall's claim must fail.

The Supreme Court noted in *Roth* that a property interest in employment is created not by the Constitution but "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of *entitlement* to those benefits." 408 U.S. at 577, 92 S.Ct at 2709 (emphasis added). It is not enough that a statute prohibits the dismissal of an employee for certain specified reasons. For that employee to have a constitutionally protected property interest in his job, the statute must provide the employee with an objectively reasonable expectation that he is entitled to retain it. In *Garrow v. Gramm*, 856 F.2d 203 (D.C. Cir.1988), we were required to determine whether restraints created by a portion of the Civil Service Reform Act of 1978, 5 U.S.C. § 2302(b)(10) (1982), met this standard. Section 2302(b)(10) prohibits adverse personnel action based on off-duty conduct that does not adversely affect job performance. We concluded that even though the section restricted management's unfettered discretion to discharge an employee at will, it did not create a legitimate expectation of continued employment such as to establish a property interest. As the restrictions embodied in D.C. Code Ann. § 1–616.2 are even more modest, they cannot be construed as giving rise to a legitimate claim

of entitlement to continued employment.

Second, appellant claims that he was assured orally by then-President Green that he would not be dismissed except for cause. Complaint at ¶ 11, App. at 4; Complaint at ¶ 32, App. at 9. After these alleged assurances, however, appellant signed an agreement providing that he would serve at the pleasure of the President. "Where after oral negotiations parties enter into a written contract, their rights must be controlled by their contract. Its terms cannot be varied by parol evidence...." *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C.1968); *see also One–O–One Enterprises, Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C.Cir.1988) (fraud in the inducement exception to be construed narrowly).

### 2. *Liberty interest*

Appellant argues that he was dismissed shortly after the Colvin memorandum surfaced (*see above* at 258), implying to the world that he was fired because of malfeasance. He desires a hearing to clear his name and claims that appellees' refusal to grant him a hearing deprived him of his liberty interest in his reputation.

The Seventh Circuit recently described the interest protected by the liberty component of the Due Process Clause:

> The principle behind the "stigma" cases is not that particularly aggravated forms of defamation violate the due process clause when committed by public officials, but that dismissal to the accompaniment of serious public charges of misconduct may prevent the employee from obtaining other employment of comparable responsibility—may, in a word, operate to blacklist him from such employment, thereby depriving him of his occupational liberty.

*Jungels v. Pierce*, 825 F.2d 1127, 1131 (7th Cir.1987). *See also Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C.Cir.1983).

Even if we assume that the Colvin memorandum, followed closely by appellant's dismissal, suggested that he was fired for misconduct, appellant admits that the Pres-

ident's termination letter stated that the "decision to terminate [appellant] 'does not reflect unfavorably on your performance as Athletic Director ... [and] the University is most grateful for your work in solidifying the management controls in the Department.'" Complaint at ¶ 18, App. at 6. This statement removes any possibility that Hall was stigmatized by his dismissal. Nothing further would be gained from a name-clearing hearing.

## C. Remaining Pendent Claims

### 1. *Defamation*

■ In pertinent part, the Colvin memorandum stated: "This is not the first time that the office of the Cashier has called malfeasance to the attention of the Athletic Director...." App. at 14; *see also above* at 258. The complaint alleges that this statement

is defamatory and libelous per se in that it tends or was reasonably calculated to injure [appellant] in his reputation, profession, and community standing by charging that [appellant] was guilty of multiple acts of malfeasance.

Complaint at ¶ 38, App. at 10. This allegation is plainly mistaken. The memo does not accuse Hall of malfeasance; it merely states that acts of malfeasance within the Department have previously been brought to the Director's attention. Although appellant now attempts to argue that the memorandum is defamatory because it implies that Hall was unresponsive to malfeasance within his department, this is not the theory presented in the complaint. We will not permit appellant to amend his complaint at this stage. "It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C.Cir.1984).

### 2. *Wrongful Termination*

Appellant's final claim is that the dismissal was wrongful because it violated public policy. According to appellant, even an at-will employee cannot be terminated for reasons that violate public policy. Appel-

lant alleges that his dismissal violated the public policy protecting free speech by employees, as codified in D.C.Code Ann. §§ 1-616.1 *et seq.* (1981). Complaint at ¶¶ 44-48, App. at 11. The district court properly rejected this claim.

In considering this pendent claim, we are of course bound by the law of the District of Columbia, as authoritatively interpreted by the D.C. Court of Appeals. In *Ivy v. Army Times Publishing Co.*, 428 A.2d 831 (D.C.1981) (en banc), the D.C. Court of Appeals refused to rehear an unpublished memorandum opinion that had affirmed the dismissal of an employee's complaint. The panel had followed *Taylor v. Greenway*, 173 A.2d 211 (D.C.1961), and *Pfeffer v. Ernst*, 82 A.2d 763, 764 (D.C.1951), which held that an employment contract of indefinite duration may be terminated for any reason by either party, and refused to create an exception to this rule for dismissals that violate public policy. Three of the eight members of the Court of Appeals dissented from the denial of rehearing en banc. The dissenters recognized that the panel was bound by *Taylor* and *Pfeffer*, and thought that the en banc court should reconsider those cases insofar as they barred a cause of action for wrongful termination. 428 A.2d at 831. A fourth judge agreed that the case should be reheard en banc, but did not concur fully in the accompanying dissent's statement. 428 A.2d at 836.

■ The clear lesson of *Ivy* is that the District of Columbia does not currently recognize a public policy exception to the at-will termination doctrine. *See Downey v. Firestone Tire & Rubber Co.*, 630 F.Supp. 676, 681 (D.D.C.1986); *Parker v. National Corp. for Housing Partnerships*, 619 F.Supp. 1061, 1067-68 (D.D.C.1985); *Weaver v. Gross*, 605 F.Supp. 210, 216 (D.D.C. 1985). *Contra Newman v. Legal Servs. Corp.*, 628 F.Supp. 535, 538-39 (D.D.C. 1986). *Cf. Minihan v. American Pharmaceutical Ass'n*, 812 F.2d 726, 729 n. 2 (D.C. Cir.1987) (D.C. has not yet recognized cause of action for breach of implied contractual covenant of good faith).

### III. CONCLUSION

We affirm the district court's conclusion that the government's interest in ensuring the effective administration of the University outweighed appellant's right to speak on matters of public concern within his area of responsibility. We also agree that appellant has failed to state a cause of action for violation of his right to property and liberty without due process, for breach of contract and promissory estoppel, for defamation, and for wrongful termination. The judgment of the district court is therefore

AFFIRMED.