**Kuo–Yun TAO, Plaintiff,**

v.

**Hon. William SESSIONS, Individually and as Director, Federal Bureau of Investigation, et al., Defendants.**

**Civ. A. No. 92–0144 (GHR).**

United States District Court,
District of Columbia.

Dec. 3, 1992.

Lonnie C. Rich, Rosenthal, Rich, Grimaldi & Guggenheim, Alexandria, VA, for plaintiff.

Marina Utgoff Braswell, Asst. U.S. Atty., Washington, DC, for defendants.

## MEMORANDUM OPINION

REVERCOMB, District Judge.

Before the Court are the cross-motions for summary judgment of plaintiff Kuo–Yun Tao and defendants William Sessions, the director of the Federal Bureau of Investigation ("FBI" or "Bureau"), and Steven L. Pomerantz, the Deputy Assistant Director–Personnel Officer for the Bureau's Administrative Services Division. Ms. Tao claims that defendants individually and in their official capacities violated her constitutional rights under the First and Fifth Amendments in the manner in which they handled her internal appeal of the denial of her application for promotion to the position of Language Specialist at the GS–12 level. Her complaint seeks declaratory and injunctive relief, including an Order from this Court that sample translations submitted by Ms. Tao as part of her application for promotion "be reviewed by appropriate 'outside' translators whose evaluations will be accorded the same consideration for plaintiff's promotion as was accorded other comparable employees." Complt. at 13–14. The Court has reviewed the parties' pleadings, briefs and supporting exhibits, and has heard oral argument. On the basis of this record, the Court will issue an Order today denying plaintiff's Cross–Motion for Summary Judgment, granting defendants' Motion to Dismiss, Or in the Alternative for Summary Judgment, and dismiss the case.

## FACTS

Ms. Tao is a United States citizen of Chinese descent. She has been an employee of the FBI since 1979 and is currently employed by the Bureau as a GS–11 Language Specialist. In her present job, she is one of eight Language Specialists in the Language Services Unit ("LSU") at the Washington Metropolitan Field Office ("WMFO") of the FBI. All of the Language Specialists at the WMFO are Chinese–Americans. *See* Complt. ¶¶ 5–7.

In November, 1990, Ms. Tao applied for promotion to the GS–12 grade. According to the requirements then in effect for FBI Language Specialists, such a promotion entailed meeting four criteria, one of which was "submission of work examples for review by LSU for *accuracy, relevance and conciseness.*" *Id.* ¶ 8 (emphasis added). In addition, the FBI required Language Specialists seeking promotion "to summarize the conversations on a tape provided by LSU ... LSU will review the additional summaries along with other work examples." This fifth requirement is commonly referred to as the "mystery tape" requirement. *See id.* ¶ 9. Both the mystery tape and work example requirements entailed translations.

Thus, as part of her application for promotion, Ms. Tao set about to prepare a translation of the mystery tape and to submit two-hour work exemplars. It is important to understand—and this is not disputed—that these translations were time-consuming and required considerable effort. Plaintiff claims to have spent about 20 hours on her mystery tape translation and 7 hours on her work examples. *See id.* ¶¶ 12–13.

Ms. Tao was one of three Language Specialists in the WMFO who sought promotion to a GS–12 grade in late 1990. The other two applicants, Dennis Chang and Pearl Lau, submitted applications at about the same time that Ms. Tao submitted hers. Pl.'s Statement of Material Facts as to Which There is No Genuine Issue ¶ 1.

These applications, like Ms. Tao's, included mystery tape translations and work exemplars, which were reviewed by a senior translator in the LSU. *Id.*

In a memorandum dated January 17, 1991, an LSU manager recommended that Ms. Tao's application for promotion be denied. *See* Complt. Ex. 1; Complt. ¶ 16. Two reasons were given for this recommendation, the first of which had to do with deficiencies found in Ms. Tao's translations:

> The Language Services Unit (LSU) had a senior Translator review Ms. Tao's work product. The reviewer found that the transcript of the "mystery tape," although accurate, lacked conciseness or organization of content. The same problems were evident in the work exemplar. Also, there is no justification why some information was skipped and some given detailed treatment. The result is that some dates, times and places are not mentioned, the purpose of the call is not always identified, and impertinent matters are not regularly minimized or eliminated.

Complt. Ex. 1. The second reason given was that the WMFO had presented Ms. Tao's qualifications for promotion only in a general way, without specifying examples of GS–12–level work. *Id.* In other respects, however, it appears Ms. Tao met the criteria for promotion.

The FBI subsequently denied the promotion applications of Dennis Chang and Pearl Lau as well. In the case of Mr. Chang, a memorandum from the same LSU manager, dated January 29, 1991, recommended denial for the following reason:

> The Language Services Unit (LSU) had a senior translator review Mr. Chang's work product. The reviewer found that the translations of the [word or words redacted] contained numerous mistranslations and omissions of words, phrases, and sentences. Also, it was noted that significant points were left out in the summaries of the "mystery tape" and from the work exemplars. Conciseness was also a problem.

Pl.'s Ex. 3. The memorandum also noted the failure of the WMFO to provide specific examples of GS–12–level work undertaken by Mr. Chang. *Id.* In the case of Ms. Lau, a memorandum dated March 7, 1991, recommended denial of promotion for the sole following reason:

> The Language Services Unit (LSU) reviewed LS Lau's work for accuracy, relevancy, conciseness and institutional knowledge required for the position sought. A pattern of errors was found regarding accuracy inasmuch as there was a large number of mistranslations, some very serious. In addition, there were items of information omitted from the "mystery tape" summary which should have been included in order to make the meaning complete. The reviewer also found that Ms. Lau tends to make insertions that are her own presumptions.

Pl.'s Ex. 5.

Ms. Tao filed an administrative appeal on January 25, 1991, in which she disputed the conclusions that her translation work lacked conciseness and organization, omitted information without justification, included impertinent matters, and failed to mention some dates, times and places. *See* Complt. Ex. 2. Then, on March 8, 1991, Ms. Tao's husband, Louis L.S. Tao, an attorney, wrote to defendant Sessions to enter an appearance on his wife's behalf and to submit a memorandum of law and facts in support of her administrative appeal. *See* Complt. Ex. 3. Mr. Tao's letter to Director Sessions contained the following observation about FBI promotion practices with regard to Chinese–Americans:

> For approximately three years (1987–1990) FBIHQ LSU denied all requests for promotion (GS–11 to GS–12) forwarded by WMFO for its Chinese–American LSs but granted promotion for many other LSs of different ethnicity, national origin or race. This appeal is the first voice of protest from a Chinese–American LS against such practice as well as against LSU's arbitrariness and caprice.

*Id.*

Mr. Chang and Ms. Lau, in contrast, did not formally appeal their initial denials, which were reversed and their promotions

approved after a second FBI reviewer and a reviewer from outside the Bureau found the translations to be accurate after all. *See* Complt. ¶¶ 42, 46; Defs.' Statement of Material Facts as to which There is No Genuine Issue ¶¶ 8, 11. In the internal memorandum recommending the promotion of Mr. Chang and Ms. Lau, the Bureau noted that the LSU Unit Chief had issued orders that, henceforth, all promotion packages would be given to two senior translators at the outset, ostensibly "[b]ecause LSU clouded the issue in these matters by originally giving the package only to one reviewer and then turning down the promotions based upon only one reviewer's comments." Pl.'s Ex. 7 (attached to plaintiff's motion).

The FBI treated Ms. Tao differently. During the course of negotiations with Louis L.S. Tao, FBI officials appeared to take the position that the WMFO would reassess Ms. Tao's translation work and prepare a more detailed description of her prior tasks and that she could reapply for promotion on or after July 17, 1991. *See* Complt. Exs. 4, 5, and 7. By August, 1991, however, Bureau officials took the view that reapplication include "retesting," that is, that Ms. Tao complete a new mystery tape translation and submit new work exemplars. *See* Complt. Ex. 8. Ms. Tao, through counsel, objected to being retested on the ground that similarly situated employees—Mr. Chang and Ms. Lau—had not been required to submit new material when their initial promotion denials were reviewed. *See* Complt. Exs. 10, 11. In a letter to Mr. Tao, dated November 7, 1991, and constituting the FBI's final administrative determination and decision on her appeal, defendant Pomerantz wrote:

> As outlined in my letter of July 25, 1991, WMFO has been instructed to initiate steps to reassess Mrs. Tao's work products; provide their evaluation of her work; and have Mrs. Tao submit work products so that LSU can make a determination whether she is eligible to receive favorable consideration for promotion.

Complt. Ex. 12. Notwithstanding the use of the verb "to reassess," Bureau officials apparently understood the decision to require Ms. Tao to submit new mystery tape and work exemplar translations—i.e., to be "retested"—rather than to have her previous translations reviewed by a second FBI reviewer and/or outside reviewer as was done for Mr. Chang and Ms. Lau. *See* Complt. Ex. 13.

The FBI does not now dispute that it required and requires Ms. Tao to submit new work samples and translations to be reviewed by the LSU and that Mr. Chang and Ms. Lau were not so required. *See* Defs.' Statement of Material Facts As to Which There is No Genuine Dispute ¶ 9. The Bureau contends that the reason for this difference in treatment is that Ms. Tao's promotion was denied for a different reason: The promotions of Mr. Chang and Ms. Lau were initially denied because their translations were initially believed to be inaccurate and subsequently found not to be so; the promotion of Ms. Tao was initially denied because her translations, while accurate, were found to lack conciseness and substantial content. Decl. of Bonnie L. Jenkins ¶¶ 4–8.

## ANALYSIS

The core of this lawsuit, thus, is this: Ms. Tao claims that the FBI treated her differently than comparably situated applicants for promotion by requiring *her* to undergo time-consuming and burdensome retesting on translations that the Bureau concedes were accurate according to its own criteria. She argues that the initial denials of her promotion and the promotions of Mr. Chang and Ms. Lau were for substantially identical reasons, notwithstanding the FBI's characterization of her case as having to do with problems of conciseness and organization and the cases of Mr. Chang and Ms. Lau as having solely to do with the accuracy of their translations. *See* Jenkins Decl. ¶ 5. From these contentions Ms. Tao asserts two legal claims, both arising under the Constitution. First, and foremost, she asserts that the FBI's decision that she be retested on her translations invidiously discriminates against her in violation of her right to

equal protection under the Fifth Amendment. Second, she asserts that this same decision was made in retaliation for her having taken an administrative appeal of and otherwise protesting the promotion denial and as such violates her rights under the First Amendment.

Neither of these claims is persuasive to the Court. While Ms. Tao may have some justifiable grievance over the Bureau's review of her application for promotion, her lawsuit runs afoul of the principle "that not every difference in promotion treatment rises to the level of a deprivation of equal protection." *Thomas v. Board of Examiners, Chicago Public Schools*, 866 F.2d 225, 227 (7th Cir.1988) (*per curiam*) (citing *Clark v. Whiting*, 607 F.2d 634, 638 (4th Cir.1979)), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 405 (1989). Her First Amendment claim is defective for a similar reason.

1. *The Equal Protection Claim*

■ With regard to her equal protection claim, it is significant that Ms. Tao does not allege in her complaint that the FBI, in denying her promotion to a GS–12 grade, discriminated against her because of her membership in a suspect or quasi-suspect class, such as a classification based on race or sex, which the courts will subject to strict or heightened scrutiny. *See Padula v. Webster*, 822 F.2d 97, 102 (D.C.Cir.1987). Indeed, Ms. Tao's argument at bottom is that the FBI arbitrarily discriminated against her as an individual in not according *her* the same treatment it gave Mr. Chang and Ms. Lau. Yet, as defendants correctly point out, the equal protection clause is directed towards discrimination by the state "between *classes* of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 2443, 41 L.Ed.2d 341 (1974) (emphasis added). The Court has reviewed the cases cited by plaintiff and is not persuaded that they stand for the contrary. *See, e.g., Mayer v. Chicago*, 404 U.S. 189, 193, 92 S.Ct. 410, 414, 30 L.Ed.2d 372 (1971) (holding that ability to pay was not a rational classification in making trial transcripts available for criminal appeals);

*McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961) (stating, in connection with a review of the constitutionality of Maryland Blue Laws, that "the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite"); *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944) (holding that the failure of state officials to certify that an unsuccessful candidate in a primary election was a duly elected nominee of his party was based upon a permissible classification).

Thus, "[a] person bringing an action under the Equal Protection Clause must show intentional discrimination against him *because of* his membership in a particular class, not merely that he was treated unfairly as an individual." *Huebschen v. Dep't of Health and Human Servs.*, 716 F.2d 1167, 1171 (7th Cir.1983) (emphasis added). Where public employees have sought review of adverse personnel actions, moreover, federal courts have declined to intervene on equal protection grounds absent a showing of discrimination because of race, or sex, or the assertion of some other constitutionally protected right. As the court in *Clark v. Whiting* put it,

[f]ederal courts ... have never been hesitant to intervene on constitutional grounds in hiring, discharge or promotion of public employees ... where the asserted claim is that the action taken was tainted by racial or sex discrimination or was intended to penalize for the exercise of First Amendment rights. But, absent such impermissible sex or racial discriminations or First Amendment restraints—clear violations of positive express constitutional or statutory mandate—"[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed

to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."

607 F.2d at 638–39 (quoting *Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976)) (emphasis added). Ms. Tao does not argue—and the Court sees no evidence in the record—that the FBI treated her differently than similarly situated applicants for promotion because of her race or her sex. To this extent, therefore, the Court is in agreement with defendants that plaintiff has failed to state an equal protection claim.

### 2. The First Amendment Claim

Plaintiff's First Amendment claim rests on the assertion that the FBI's decision that she must be retested before she could reapply for promotion constituted a reprisal or retaliation for her exercise of constitutionally protected rights. First, Ms. Tao contends that this decision was made in reprisal for her exercise of her right of free speech in connection with the statement, in the March 8, 1991, letter from Louis Tao to defendant Sessions, that the denial of promotions to Chinese–Americans in the LSU was discriminatory. Second, Ms. Tao contends that the decision that she alone must be retested was, in effect, retaliation for formally appealing in the first place, and as such violated her right to petition the the government for redress of grievances. She claims, in short, is that she was singled out for differential treatment *because* she challenged the Bureau's handling of her application for promotion and raised the issue of racial or ethnic discrimination in so doing.

█ As a threshold matter, defendants argue that allowing Ms. Tao to reapply for a promotion by submitting new translation materials can hardly be considered "retaliation" or a denial of her right to petition the government for redress of grievances. The Court agrees and believes, moreover, that this point is dispositive of Ms. Tao's First Amendment claim. As a matter of logic, the analysis of a *"Pickering* cause of action," *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988) (discussing the elements set forth in *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny), requires a showing that the public employer took some action that may be characterized fairly as adverse to the plaintiff's employment status. Thus, courts have considered retaliation claims in cases involving discharge or termination from employment, *see, e.g., Rankin v. McPherson*, 483 U.S. 378, 382, 107 S.Ct. 2891, 2895, 97 L.Ed.2d 315 (1987); *Pickering v. Board of Educ.*, 391 U.S. 563, 566, 88 S.Ct. 1731, 1733, 20 L.Ed.2d 811 (1968); *Hall v. Ford*, 856 F.2d at 257, suspension or other disciplinary action, *see, e.g., Murray v. Gardner*, 741 F.2d 434, 437 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985), failure to hire when the applicant was otherwise well-qualified for the position, *see, e.g., Hubbard v. Environmental Protection Agency*, 949 F.2d 453, 455 (D.C.Cir.1991), or demotion or reassignment from an existing position. *See, e.g., Callaway v. Hafeman*, 832 F.2d 414, 415 (7th Cir.1987).

No such adverse action, not even the decision not to promote her in the first instance, is alleged by Ms. Tao to have occurred or to have constituted the retaliation against her. Instead, accepting her factual allegations as true, the FBI simply told her that she *would be* reconsidered for promotion when she submitted new translations and when the WMFO submitted a more specific description of her work activities at the equivalent of a GS–12 level. The Court does not believe that such a decision—even if it could be characterized as "adverse"—justifies triggering the inquiries under *Pickering* and its progeny. *See Hall v. Ford*, 856 F.2d at 258. To hold otherwise would fly in the face of "the common-sense realization that government offices could not function if every employment decision became a constitutional mat-

**30**

ter." *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983) (footnote omitted).

Nor does the Court believe that the record here supports Ms. Tao's characterization that the FBI's decision on retesting in effect singled her out because she appealed and because she questioned the Bureau's promotion practices towards Chinese–American employees. That characterization depends on the assertion that her application for promotion was denied in the first instance for substantially the same reasons as the applications of Mr. Chang and Ms. Lau. While Ms. Tao's case was not as starkly dissimilar from the cases of the other two Language Specialists as defendants argue, it was not as substantially similar as she claims either. *Compare* Jenkins Decl. ¶ 5 ("In both the cases of Dennis Chang and Pearl Lau, the only concern was one of accuracy of their translations of the "mystery tape") *with* Pl.'s Exs. 3 & 5 (indicating that omissions of relevant words and conciseness, in addition to accuracy, were problems). Rather, the record before the Court fairly reflects the conclusion that the perceived deficiencies in the Chang and Lau translations were largely ones of accuracy, while the perceived deficiencies in Ms. Tao's translations were entirely ones of conciseness and relevance. There was thus a basis—and in the Court's opinion, a rational basis—for treating Ms. Tao differently.

In the final analysis, Ms. Tao's case calls to mind the maxim that not every error, mistake, perceived unfairness, or slight made by a public employer rises to the level of a constitutional case meriting judicial review by a federal court. *See Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90; *Bishop v. Wood,* 426 U.S. at 349–50, 96 S.Ct. at 2079–80. While the Court cannot say on this record that the FBI conducted its negotiations with Ms. Tao during the course of her appeal with utter and complete propriety, the Court firmly believes that it must adhere to well-established principles and resist the constitutionalization of public sector employment law without more grounds than are presented in this case. *Connick* may once again be appropriately

quoted here: "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review *even if the reasons for the dismissal are alleged to be mistaken or unreasonable.*" 461 U.S. at 146–47, 103 S.Ct. at 1689–90 (citing *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bishop v. Wood, supra* )) (emphasis added).

Accordingly, for the reasons stated above, the Court will enter an Order this day granting defendants' Motion to Dismiss, Or in the Alternative for Summary Judgment, denying plaintiff's Cross–Motion for Summary Judgment, and dismissing the case. Because the case is dismissed as a matter of law, the Court will also dismiss plaintiff's Motion for Rule 56(f) Discovery as moot.