**Joan V. JONES, Plaintiff,**

v.

**David RIVERS, et al., Defendants.**

**Civ. A. No. 86–2276.**

United States District Court,
District of Columbia.

July 26, 1989.

---

Stephen C. Leckar, Cohen & White, Washington, D.C., for plaintiff.

Arthur D. Burger, Asst. Corp. Counsel, D.C., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Joan V. Jones brought this action against the District of Columbia and David Rivers, then Director of the District's Department of Human Services (DHS), alleging sexual discrimination and retaliation arising out of her employment at DHS. After a trial on the merits, the Court concludes, for the reasons set forth below, that plaintiff has proven by a preponderance of the evidence her case of discrimination and retaliation.

### I. Background

Joan Jones is a 47 year-old female who has, with minor exceptions, enjoyed a long career of employment with the District of Columbia in the area of health and social services. She began working for DHS' predecessor in 1965, starting as a DS-7 social worker and eventually reaching the DS-11 level as supervisor of a unit that handled over 2000 cases. Trial Transcript (Tr.) 81–84; Joint Statement of Material Facts Not in Dispute ("JS") 1. In 1973, Jones was selected as a DS-12 social welfare specialist in the office of Albert Russo, the Assistant Director for Social Services. Russo later became Deputy Director and then Director of Social Services, and plaintiff was selected as his Executive As-

sistant and Executive Officer, respectively. By 1978, Ms. Jones had been promoted to Assistant to the Director for Social Services and had reached the DS–15 grade level.

In 1979, DHS was reorganized as a result of the new administration entering under Mayor Marion Barry. Ms. Jones' position was not affected by the change, but Albert Russo resigned in 1980 and was replaced by James Burford. Dissatisfied with what she considered scaled-back responsibilities under Burford, Jones left the District government in January 1982 to accept a one-year appointment at Howard University's Graduate School of Social Work. In January 1983, plaintiff returned to DHS when she was selected for a temporary appointment as the Acting Chief of the Office of Policy and Planning (OPP), a position at the DS–15 level. In April 1983, however, that position was converted from DS–15 competitive status to the excepted service at the DS–16 level; it therefore became one of the 100 positions whose occupants serve at the pleasure of the Mayor. JS 8; D.C.Code §§ 1–610.1 *et seq.* At approximately the same time, Burford left DHS and was replaced as Director of DHS by David Rivers, who had been serving as Deputy Director since 1981. Jones received another temporary appointment as Acting OPP Chief in December 1983. Rivers was confirmed as the permanent Director of DHS in February of 1984.

The turning point in plaintiff's employment with DHS was the year 1984. In her capacity as a member of the Contracts Review Committee (CRC), an interagency group responsible for reviewing and approving DHS contracts in excess of $25,-000, Jones attended a meeting in June 1984 and voted against a contract to provide services for the homeless at the Pitts Motor Hotel. On December 2, 1984, Rivers selected Carl Wilson, who was then serving as Director of DHS' State Health Planning and Development Agency (SHPDA), to become the permanent DS–16 Chief of OPP. On that same day, plaintiff was reassigned as Assistant to the Director for Special Initiatives, a DS–15 position. Shortly thereafter, Jones filed an internal charge of sex discrimination with Rivers, who denied the charges. In June 1985, plaintiff filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC).

Ms. Jones thereafter instituted this action against the District of Columbia and David Rivers.[1] Plaintiff alleges that a pattern of discrimination exists in DHS towards women above the DS–14 grade level and contends that, since April 1980, she has been "thwarted in her efforts at career advancement" by virtue of denial of promotions, reassignments to undesirable positions, and preferential treatment given to less-qualified male employees. Complaint ¶¶ 6, 7. In Counts 1, 3 and 4, Jones maintains that this pattern and these acts constitute impermissible sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1983. Plaintiff also asserts, in Counts 2, 5 and 6, that David Rivers impermissibly retaliated against her for opposing the Pitts contract and for filing her EEOC charges, in contravention of Title VII and Section 1983.[2] Having considered all of the testimony, exhibits and evidence adduced at the five-day bench trial, the parties' post-trial submissions, and the entire record in this case, the Court finds, for the reasons articulated below, that plaintiff Joan Jones has successfully proved by a preponderance of the evidence that she was discriminated against because of her sex and that she suffered retaliation during her employment with the District of Columbia.

## II. Discussion

Plaintiff's claims fall into three categories. She asserts that she was the victim of sex discrimination because Carl Wilson, not she, was chosen for the OPP Chief position. She also maintains that Title VII was transgressed because David Rivers retaliated against her for filing an EEOC

---

**1.** Rivers is sued in his official and individual capacities. Complaint at 1.

**2.** The District of Columbia is named as a defendant in Counts 1, 2, 4 and 6; Rivers is the defendant in Counts 3 and 5.

complaint. Finally, she contends that her First Amendment rights were infringed because her opposition to the Pitts Hotel contract contributed to her nonselection for OPP Chief.

### A. Discrimination Claims

■ 1. *Standards.* Jones asserts sex discrimination under both Title VII and 42 U.S.C. § 1983. Disparate treatment occurs under Title VII when a plaintiff shows that her "employer treats some people less favorably than others" because she is a woman. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The order and quantum of proof in disparate treatment cases was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and its progeny. To succeed on her claim, plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In the context of a failure to promote, this showing consists of proof that the plaintiff (1) belongs to a protected group, (2) was qualified for and applied for a promotion, (3) was considered for and denied the promotion, and (4) was passed by in favor of another employee with similar qualifications who was not within the protected group. *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981).

Once a *prima facie* case has been made, a presumption of unlawful discrimination arises, *see United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983), which the employer may rebut by "articulat[ing] some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If defendant carries this burden, the presumption "drops from the case," *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094, and the party alleging discrimination must "demonstrate that the proffered reason was not the true reason for the employment decision [and] that she has

been the victim of intentional discrimination." *Id.* at 256, 101 S.Ct. at 1095. Where, as here, a case has been fully tried on the merits, the question whether plaintiff has made out a *prima facie* case "is no longer relevant" and the court should proceed to the ultimate issue of whether discrimination has in fact occurred. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482. Finally, the *McDonnell Douglas* framework also applies to plaintiff's claim that defendants' acts of sex discrimination violated her due process rights protected under 42 U.S.C. § 1983. *Oates v. District of Columbia,* 824 F.2d 87, 90 (D.C.Cir.1987).

■ 2. *Analysis.* As noted above, plaintiff's discrimination claim is that David Rivers selected Carl Wilson, rather than her, to be Chief of OPP because she was a woman. A variety of factors, described in detail below, convinces the Court that sex discrimination promoted the selection of Carl Wilson.

Joan Jones enjoyed a remarkable and distinguished career in the Department of Human Services. She rose rapidly through the agency from a DS–7 social worker to a DS–15 Assistant to the Director for Social Services. Plaintiff performed a wide variety of tasks along the way. She served as a caseworker for the elderly, she was the supervisor of a family services unit, and she dealt with rental payment and child care problems as a social welfare specialist. While managing the Director's office as executive assistant to Albert Russo, Ms. Jones took the lead on projects relating to social rehabilitation, day care, targeted jobs and employee courtesy. In her spare time, plaintiff managed to raise a family and obtain a masters degree in social work from Howard University.

Ms. Jones was more than simply a "jack of all trades." The devotion to and quality of her work became evident at trial. Her performance evaluations throughout the years were uniformly outstanding. Plaintiff's Group Exhibit (Pl.Gr.Ex.) 1. Moreover, the special skills that Jones possessed were described by a number of witnesses. One co-worker, Bernard Phifer, agreed

with an evaluation by plaintiff's supervisor which noted that she "demonstrated the ability to work with the most difficult social problems and to be willing to attempt new treatment methods with a high degree of success." Tr. 188–89. Richard Artis, Jones' assistant at OPP, stated that "she exhibited the kinds of leadership qualities that I can professionally respond to," including delegation of authority and creativity in developing new solutions to old problems. Tr. 215–16. Calling Jones his "alter ego," Albert Russo extensively described the qualities he valued in Joan Jones:

I've always regarded Mrs. Jones as a rather extraordinary woman, with great ability, great empathy, and great feeling for clients. I often told her that she was not only client-oriented, but also community oriented. She really cared....

Several times the thought [putting Jones in charge of running a specific program] did entertain my mind, but for perhaps selfish reasons, I discarded the idea ... And while I felt that she had certainly the ability to run several major programs within the Department, I felt that I wanted her to continue in her staff position because of the invaluable services she was providing.

During the seven years Mrs. Jones worked with me, she extraordinarily manifested the highest qualities of leadership that I have yet encountered up to that point in time in any female employee, or in any male employee.

Tr. 254–259. Carl Wilson, a subordinate of Jones until he was selected as Chief of OPP (and a man who certainly had no motive to give such testimony), agreed that she was "very analytical," very helpful," "very patient," and "cooperative." Tr. 326. Even David Rivers admitted that Jones was an "intelligent," "compassionate," "dedicated" and "committed" employee. Tr. 625–26.

Another measure of Ms. Jones' unusual abilities was the warm personal relationship she enjoyed with members of her staff. During all of her time at DHS, not a single grievance or complaint was lodged against plaintiff by another employee, a fact that Albert Russo stated was "an exceptional tribute to her ability to work well with people, and it spoke of the excellent interpersonal relationships that she had established, both with her peers, her superiors, and her subordinates." Tr. 256. Bernard Phifer related how plaintiff was once given a standing ovation by her fellow employees, a truly rare event in bureaucratic circles.

Nonetheless, despite Ms. Jones' unblemished record of accomplishment and performance, it was Carl Wilson who was selected by Rivers for the position of Chief of OPP. Rivers maintained that plaintiff was not selected because she had not displayed "leadership" qualities while she served as acting Chief of OPP. Stating his preference for aggressive individuals, Rivers described Jones as "timid" and unable to take the difficult steps needed to properly interact with other agencies and pursue OPP programs in a timely fashion.[3] Rivers also observed that he had received complaints from other managers about Jones during her tenure as OPP Chief. Carl Wilson, according to Rivers, was better qualified to carry out the functions of OPP Chief.

The "leadership" rationale offered by Rivers was severely undermined by the evidence presented in this case. For one thing, the concern about leadership expressed by Rivers and others at trial did not surface during the nearly one-quarter century of her exemplary government service but only after it was clear that litigation by Jones was imminent. None of Jones' performance evaluations contain any reservations about her management abilities. Indeed, Rivers gave Jones an excel-

---

**3.** At another point, however, Rivers himself used the word "aggressive" to describe Ms. Jones' performance:

Q. All right. Was Joan Jones diligent in her job?

A. Yes. Joan, no question about it. No matter what happens during this hearing, Joan is

a person I've come to like and admire, given what she did best. *She was very aggressive,* she put in a lot of time in terms of taking on one situation at a time. She put in time, she was compassionate, and I think she really wanted to do a good job in that regard.

Tr. 568–69 (emphasis added).

lent performance evaluation for a one-year period in which he observed her work. Joint Gr.Ex. 3. Neither Rivers nor any other DHS official ever sent Jones a written memorandum highlighting existing deficiencies that needed to be corrected. The subject of leadership was not broached when Rivers informed Jones that he had selected Wilson for the job; to the contrary, Rivers said that Jones was a good manager but, citing his "management prerogatives," informed her that the decision was the result of an "executive rotation." When Jones filed an internal grievance, and later an EEOC complaint, the responses submitted by defendants never intimated that the selection decision was influenced by her lack of leadership skills. Pl. Exs. 23, 44, 46.[4] This *post hoc* rationale, unsupported by documentary evidence, strongly suggests that defendants' reason for not selecting Jones was pretextual in nature. *See, e.g., Legrand v. Trustees of University of Arkansas,* 821 F.2d 478, 482–83 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988).

Quite apart from the late date at which the "leadership" defense appears to have been constructed (as well as its lack of documentation), defendants' characterization of Jones' performance is suspect on several other grounds. Joan Jones' record as acting Chief of OPP, for example, stands prominently in the way. For twenty three months, plaintiff performed her job with distinction. Jones developed policy proposals for centralized planning and a uniform cost schedule for agency consultants, reviewed grant applications and hearing decisions and implemented a number of Mayoral recommendations. Plaintiff was also responsible for coordinating the One Fund drive, a project that raised monies for arts and services organizations and for which Jones received letters of commendation from James Burford and Mayor Barry. Pl.Gr.Ex. 4. On a larger scale, Ms. Jones developed a program under which recipients of DHS welfare and social service funds would eliminate their dependence on public assistance. This "self-sufficiency" initiative soon assumed city-wide significance, when an inter-agency task force was established and the private sector became involved. OPP produced a comprehensive document entitled "Ten Steps to Client Self–Sufficiency," in which almost every other interested District agency expressed support. Pl.Ex. 24. In addition, Jones was actively involved in producing a teenage pregnancy prevention program within OPP, which ultimately resulted in the establishment of a blue ribbon panel and personal thanks from Mayor Barry. *See* Tr. 36–54. These accomplishments convincingly rebut defendants' contention that plaintiff was neither a leader nor aggressive enough to reach consensus with other components of DHS and agencies within the District of Columbia government.

Moreover, our court of appeals has warned that "heightened scrutiny" must be applied when an employer relies on subjective factors (such as leadership) rather than objective ones in reaching its decision. *Bishopp v. District of Columbia,* 788 F.2d 781, 787 (D.C.Cir.1986). The complaints voiced by Rivers and others were quite vague, however, lacking the degree of specificity one would normally expect when difficulties in employee performance are encountered. For example, Rivers spoke of "some dialogue" he had with Jones about several issues (such as teen pregnancy, homelessness and infant mortality) that "were hounding me," Tr. 644, yet he was unable to recall any of the times, dates or locations of those discussions and did not memorialize his concerns in memoranda to Jones, to any other DHS employee or even to his own files.[5] Audrey Rowe, then Commissioner of Social Services, testified that Jones' predecessor, Barbara Sable, was a far better Chief of OPP than Jones, that

---

**4.** Defendants' response to Jones' EEOC grievance referred to leadership in one line in describing the OPP Chief job, but no assertion was made that Jones herself was not a leader. Pl.Ex. 44 at 4.

**5.** When pressed on cross-examination, Rivers admitted that he did not have a "distinct recollection" about conversations with Jones about homelessness issues.

planning in OPP stopped when plaintiff took over and that the processing of administrative orders became bogged down under Jones. Under cross-examination, however, Rowe was impeached by prior testimony in which she admitted no opinion on Jones' effectiveness as a leader, Tr. 533, and she displayed a surprising lack of recall about planning meetings between Jones and her staff and about particular administrative orders that were allegedly not processed in a timely manner. Tr. 524–29; 541–58.[6] And although former City Councilwoman Polly Shackleton similarly questioned the effectiveness of plaintiff while heading OPP, and contrasted Jones' performance with that of her admired predecessor, Mrs. Shackleton later admitted that she had never worked directly with Jones and could identify no specific aspect of Jones' performance that was deficient. These sorts of unfocused and undocumented criticisms do not pass the "heightened scrutiny" required by *Bishopp*, especially when they are juxtaposed with the positive record of achievement compiled by Jones during her long career.

Several other DHS employees also testified. Byron Marshall accused plaintiff of failing to develop coherent budget policies; Virginia Fleming stated that Rivers never treated her (Fleming) differently because she was a woman; and Barbara Walker testified (as will be explored *infra*) about events occurring after Jones was not selected for the OPP position. Each of these individuals, however, had substantial ties to Rivers. Marshall, who enjoyed a meteoric rise at DHS, admitted that he attended basketball games and drank beer with Rivers. Fleming conceded her connections to the Barry administration, and Walker described Rivers as her "mentor." In addition, Audrey Rowe admitted that she was social friends with Rivers and with Marshall. In short, most of the witnesses offered by defendants were closely intertwined with Rivers and with each other (either personally or professionally or both) at the time of the events in question, and could scarcely be considered to be wholly objective observers.

Additional evidence of discrimination is found in the make-up of top-level employees at DHS. On October 1, 1984, David Rivers signed an affirmative action report as Director of DHS. Pl.Ex. 20. The report found that females, both black and white, were underrepresented at the DS–16 level in the agency and set hiring goals to alleviate that disparity. David Rivers' actions, however, failed to keep the spirit of that document. Although Rivers boasted that he brought several women onto his staff, none was hired at the DS–16 level. More significantly, of the thirteen managers occupying DS–16 positions or higher from 1981 to 1986, only three were women, two of whom received their DS–16 appointments *after* plaintiff filed her sex discrimination grievance.[7] This situation stands in stark contrast to the situation of DHS as a whole: in 1985, for example, a full two-thirds of all employees at DHS were women. Pl.Ex. 34, ¶ 13. The nonselection of Joan Jones, therefore, was not an isolated event, for it is consistent with a pattern that existed at the highest echelons of DHS management. Having advanced without a negative mark on her record to that point, plaintiff was confronted with a situation where her sex became an impediment to further advancement.

---

**6.** The following colloquy, just one of many, took place regarding a memorandum and questionnaire that Rowe received dealing with self-sufficiency:

Q. And exactly when did you receive that memo and questionnaire, Mrs. Rowe?
A. I can't remember. It was right after the project. It was either a part of the initial development of the project or after the project got started, part of the information-gathering process.
Q. For what year, Mrs. Rowe?
A. As I said, I don't remember.

Q. And how many pages was the memorandum, Mrs. Rowe?
A. I have no idea.
Q. What particular problem did you have with the memorandum in which you say it wasn't well thought out, Mrs. Rowe?
A. The whole project, as far as I was concerned.
Tr. 516–17.

**7.** The testimony of two of the DS–16 women, Rowe and Fleming, has been previously noted.

There finally remains to be considered the selection of Carl Wilson. Although Rivers stated that he chose Wilson because he was better qualified that Jones, Wilson's own testimony indicates that Rivers had decided to remove Jones first, and only then cast about for a suitable replacement:

Q. Mr. Wilson, you talked about your [sic] becoming OPP Chief and applying for the position. As I understand it, you knew that position was posted in 1983; isn't that true?

A. That's true.

Q. And you didn't apply at that time.

A. No, I did not.

Q. You looked at the posting, considered it, but were happy where you were. Isn't that true?

A. That's true, yes.

Q. And later on, in the fall of 1984, David Rivers sought you out to become the OPP Chief, isn't that correct?

A. That's correct.

Q. And before that time you really weren't interested in the job; isn't that true?

A. That's correct. I really didn't pursue the job prior to that.

Q. And what David Rivers told you was that Joan Jones was going to move on; isn't that true?

A. He indicated that she would be moving to another position, yes.

Tr. 339. Several other considerations also undermine Rivers' choice of Wilson. For one thing, the bulk of Mr. Wilson's experience was in the area of health, not (as in the case of Jones) in the provision of social services. In addition, Wilson's major accomplishment as head of SHPDA, the development of a state health plan, was pursued in accordance with federally-produced criteria, a situation that would seem to contradict Rivers' desire for a creative person in the OPP Chief's position. Finally, Richard Artis, who was the only subordinate of both Jones and Wilson to testify at trial, stated his opinion that Jones was the "more effective leader" of the two. Tr. 216. Given these circumstances, the sterling achievements of Jones during her long career at the agency, the fact that Jones had served admirably in the OPP Chief position for twenty three months, and the failure of DHS and Rivers to alleviate the severe underrepresentation of women at the GS–16 level, the aggressive recruitment of Jones' subordinate (who was content in his own position) to take the job she was performing does not appear to be a legitimate and justified managerial decision.

Wilson's selection is understandable only if one concludes, as the Court now does, that it was motivated by discrimination based on sex. While this determination is never lightly reached, the evidence presented points unmistakably in that direction. A woman enjoys a steady and rapid rise through the ranks of the District of Columbia government, serving with distinction whenever she is called on. She is considered an extraordinary employee. Upon reaching a level dominated by men, she is passed over (in favor of a man) for a position that she has already held for almost two years. The man who refused to promote her, and several of his close associates, now maintain that she lacked "leadership" abilities. Unlike the woman's stellar record of achievement and accomplishment, however, these concerns are not set forth in any contemporaneous documentation, and thus might well be considered as pretextual (especially when viewed through the prism of her prior accomplishments). These facts speak clearly. They demonstrate that Joan Jones was not selected as Chief of the Office of Planning and Placement because she was a woman. No other reasonable conclusion may be drawn from the evidence.

### B. *Retaliation: Title VII*

■ 1. *Standards.* In Count 2, plaintiff contends that David Rivers retaliated against her because she opposed his acts of discrimination and because she filed discrimination charges with the EEOC, in violation of Title VII. In analyzing that claim, the Court is also guided by the *McDonnell Douglas* formulation used in disparate treatment cases. The *prima facie* case differs, however. To show retaliation, plaintiff must prove that (1) she was engaged in a statutorily-protected activity;

(2) an adverse personnel action was taken against her; and (3) a causal link exists between the two. *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). A causal connection may be established by proving that "the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C.Cir. 1985).

▪ *2. Analysis.* It is evident that, when plaintiff lodged her internal grievance with David Rivers on December 21, 1984 and her EEOC charges in May 1985, she was engaged in activity protected by Title VII. 42 U.S.C. § 2000e–3. It is equally clear that, soon after these complaints were registered, adverse employment action was taken. Jones testified that immediately after she filed her internal grievance Rivers called her on the telephone. Using an angry voice and shouting, Rivers told her that she should not have gotten a lawyer to file a grievance, that Jones would never become Chief of OPP as long as he was Director of DHS and that, if she wanted a "shoot-out," he would give her one. In his testimony, Rivers only denied that he had used the words "shoot out" but did not challenge any other aspect of plaintiff's recollection of the call. Tr. 593–94. Soon thereafter, the nature of plaintiff's employment changed drastically. Occupying a position—Special Assistant to the Director for Special Initiatives—that David Rivers acknowledged would be downgraded when she left it, Jones first saw her duties taken from her and given to Brenda Walker, a former student intern who viewed David Rivers as her mentor. Plaintiff soon found that Walker was reviewing her correspondence and critiquing her "Ten Steps to Self–Sufficiency" plan. Although Walker testified that she performed similar tasks in other areas, plaintiff's situation was different, since she had pioneered the self-sufficiency initiative and was Rivers' special assistant on that issue.

More significantly, however, Ms. Jones' efforts to craft programs and carry out projects were stifled at every turn. The cornerstone of the self-sufficiency program, the establishment of an Office of Self–Sufficiency (OSS), was stalled under the administration of Rivers, who again asserted vague concerns about the "structure" and "coordination" of the OSS.[8] Ultimately, Byron Marshall, who also expressed reservations about the plan, approved the OSS after working out differences he had with Jones. A more blatant instance occurred when Rivers was scheduled to testify before the City Council in 1986. To prepare Rivers for anticipated questions from Councilwoman Shackleton, Jones prepared a memorandum describing how approximately 440 individuals had received training through OSS programs. Pl.Ex. 26. At the hearing, however, Rivers stated that only 17 people had been trained. After the meeting, budget monies were taken from OSS and transferred to the Income Maintenance Administration (IMA), a component of the Commission on Social Services. Rivers described his statement as a "mistake," and defendants maintained at trial, through the testimony of Marshall and Shackleton, that the decision to shift the funds was made because OSS was duplicating the efforts of IMA in the area of training. On cross-examination, however, Shackleton could not provide any details of the nature of the alleged duplication and Marshall admitted that the transfer of funds resulted from the City Council hearing. On another occasion, Ms. Jones began preparations for a nationwide conference on self-sufficiency to be held in the District of Columbia, developing a conference notice and a planning workbook. Pl.Gr.Ex. 30a & e. Rivers postponed the conference, stating at trial that he had "not been briefed fully" and was "not comfortable enough" with event plans. This concern, however, directly contradicts Mr. Rivers' avowed desire for "aggressive" action within DHS. In addition, although Marshall noted that he did not believe that

---

**8.** In response, Jones' staff wrote an unsolicited memorandum outlining their concerns and expressing their frustration with the pace of implementation of the self-sufficiency initiative. Pl.Gr.Ex. 31.

Jones could arrange all the conference details in a short period of time, he later conceded that he had no idea of how long Jones and OSS had been planning the event.

It is ironic that, although Rivers complained that Jones was not aggressive enough in carrying out programs during her tenure as OPP Chief, he undertook to frustrate creative attempts made by plaintiff after she filed her discrimination complaint. Although a full accounting of plaintiff's allegations is unnecessary, the examples cited above demonstrate, without doubt, that plaintiff suffered adverse employment actions after she filed her EEOC grievance. Moreover, the sheer number of incidents and their timing demonstrate that these actions were causally related to the filing of plaintiff's EEOC charges. Accordingly, the Court concludes that defendants impermissibly retaliated against plaintiff because she filed an EEOC complaint.

## C. *Retaliation: First Amendment*

■ 1. *Standards.* Counts 5 and 6 assert that David Rivers transgressed plaintiff's right to free speech guaranteed under the First Amendment. Plaintiff maintains that Rivers retaliated against her because she opposed a contract for the Pitts Hotel, an emergency shelter for homeless, by selecting Wilson for the OPP Chief's job. In *Hall v. Ford*, 856 F.2d 255 (D.C.Cir.1988), our court of appeals recently summarized the law governing such claims:

> The *Pickering* [*v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)] cause of action has four elements. First, the public employee must have been speaking on a matter of public concern. If the speech is not of public concern, "it is unnecessary ... to scrutinize the reasons for [the] discharge," *Connick v. Myers*, 461 U.S. 138, 146 [103 S.Ct. 1684, 1689, 75 L.Ed.2d 708] (1983), at least "absent the most unusual circumstances." *Id.* [461 U.S.] at 147 [103 S.Ct. at 1690]. Second, the court must

> "balance" the interests of the employee, "as a citizen, in commenting upon matters of public interest, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568 [88 S.Ct. at 1734]. Third, the employee must prove that his speech was a substantial or motivating factor in his discharge. *Mt. Health City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 [97 S.Ct. 568, 576, 50 L.Ed.2d 471] (1977). Finally, the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct. *Id.*

*Id.* at 258.

2. *Analysis.* The Pitts contract came before DHS's Contracts Review Committee (CRC) on June 22, 1984. At the meeting, plaintiff expressed numerous reservations that she had about the contract: its excessive cost, its staffing patterns, the effect that the Pitts arrangement would have on families and the fact that the contract ran for three years rather than one. These comments clearly relate to a matter of public concern, which is speech that involves " 'issues about which information is needed or appropriate to enable members of society' to make informed decisions about the operation of their government." *Hall*, 856 F.2d at 259 (citations omitted). Reservations about the manner and cost of providing shelter and care for the homeless of the District of Columbia surely meets this test.[9]

Jones' interest in commenting on these matters of political and social concern must next be weighed against the government's interest. In that regard, the Supreme Court has identified the following relevant factors:

> whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speak-

---

9. That plaintiff did not make her concerns public does not (as defendants suggest) alter this conclusion. *Hall*, 856 F.2d at 260 (a matter of public concern does not "lose its importance merely because it arises in an employee dispute").

er's duties or interferes with the regular operation of the enterprise.

*Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). At trial, defendants did not present any evidence that Ms. Jones' statements about the Pitts contract affected employee relations or that they interfered with the operations of the DHS; indeed, despite plaintiff's comments, the contract was approved by the CRC. Accordingly, there is no government interest that would justify retaliation against Ms. Jones.

Defendants' principal focus at trial concerned the third and fourth *Pickering* factors—whether plaintiff had proved that her opposition to the Pitts contract was a substantial or motivating factor in her non-selection as OPP Chief and whether Wilson would have been selected even had plaintiff not expressed problems with the Pitts contract. The evidence adduced on these issues supports plaintiff's retaliation claim.

Immediately after the Pitts vote, Rivers telephoned Jones. According to plaintiff, Rivers berated Jones for her vote, told her to address any concerns that she might have to Audrey Rowe and slammed down the telephone. Rivers acknowledged that his voice was not pleasant and that he "chewed her [plaintiff] out" on the telephone. No other CRC member who voted against the contract was called. Nevertheless, Rivers strenuously maintained that his displeasure was not due to her vote against the contract, but rather because Jones had simply voted "no" without providing any alternatives for the housing of homeless people. On cross-examination, however, Rivers admitted that alternatives to Pitts *did* in fact exist, such as a request for procurement and quantum meruit payments. Moreover, Rivers' recollection of his call to Jones was also somewhat confused. He initially stated that he told Jones of his concerns and, when she said nothing in response, he hung up the phone. Tr. 586. He later changed his view:

Q. And what happened next? Did you hear anything coming on the other end of the line?

A. I made my concern known to Joan. And I don't recall her saying anything, whether it was—*it was probably because I hung up the phone, probably.*

Tr. 671 (emphasis added). By his own admission, then, Rivers did not allow Jones to respond. Given these contradictions, Rivers' version of events loses credibility.

Shortly after the conversation, the conditions of plaintiff's employment deteriorated rapidly, as described elsewhere. In October 1984—just four months later—Rivers informed plaintiff that he had selected Carl Wilson for OPP Chief. Given the proximity in time of this decision to the Pitts opposition, the inconsistencies in Rivers' testimony, and the failure of defendants to articulate any legitimate reason for their promotion decision, the Court must conclude that plaintiff's vocalized concern about the Pitts contract was a motivating factor in the decision by Rivers to choose Carl Wilson as head of OPP.

### III. Conclusion

Joan Jones epitomized the oft-maligned notion of one who renders public service to those less fortunate than herself. The evidence presented demonstrated that her efforts and her career were abruptly halted simply because of her sex just as she reached the pinnacle of her service to the District of Columbia and its residents. Such discriminatory actions are prohibited by both Title VII and 42 U.S.C. § 1983, and plaintiff has prevailed on her claims under those statutes. Judgment shall therefore be entered in her favor.

There remains the matter of relief. At the time this action was instituted, plaintiff requested compensatory damages of $50,000 and punitive damages against Rivers in the amount of $100,000. At trial, however, plaintiff sought only $10,395 in compensatory damages and $10,000 in punitive damages. Tr. 778.[10] In addition, Ms. Jones seeks equitable relief (1) barring future

---

**10.** The compensatory damages figure represents the amount Jones expended for psychological consulting fees after she lost weight, became tense and anxious, and suffered from work-induced depression and post-traumatic stress, as well as an additional $5,000 for mental distress.

acts of discrimination and retaliation, (2) promoting her with back pay to the DS–17 level, which she maintains she would have reached absent the discriminatory conduct that defendants pursued, and (3) expunging any adverse material in files pertaining to her. She also asks for attorney's fees and costs.

The Court will defer the entry of relief for the time being. Given the delicate situation that discrimination suits can often produce, it appears useful for the parties to explore the question of relief among themselves, attempting to reach agreement consistent with the Court's findings and in a manner that would accommodate both plaintiff's rights and injuries as well as the District of Columbia's personnel and administrative requirements. If the matter is not resolved, the Court will conduct a hearing on September 26, 1989 at 3:30 p.m. for the purpose of making its own determination in this regard.

A separate Judgment accompanies this Memorandum Opinion.

### JUDGMENT

In accordance with the Memorandum Opinion issued this date, judgment is hereby entered in favor of plaintiff, Joan V. Jones, and against defendants, David Rivers and the District of Columbia.