**Kyle MULHALL, Plaintiff,**

v.

**The DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. No. 89–1766.**

United States District Court, District of Columbia.

July 12, 1990.

Martin Francis McMahon, Steven J. Kramer, Washington, D.C., for plaintiff.

Herbert O. Reid, Sr., Acting Corp. Counsel, D.C., Martin L. Grossman, Deputy Corp. Counsel, D.C., Cary D. Pollak, Asst. Corp. Counsel, D.C., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Plaintiff is a former attorney with the Civil Division, Child Support Unit (now Child Support Section) (CSS) of the District of Columbia Office of Corporation Counsel (OCC). Defendants are the District of Columbia, Frederick D. Cook, in his official capacity as D.C. Corporation Counsel, and Arlene Robinson, in her individual and in her official capacity as Chief of the CSS. Pursuant to 42 U.S.C. § 1983, plaintiff alleges that defendants, acting under color of D.C. law, penalized him for exercising his free speech rights in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts that defendants violated his constitutional right to due process in violation of 42 U.S.C. § 1983. In addition to these federal claims, plaintiff has alleged several causes of action based on common law. Plaintiff alleges breach of contract, and wrongful discharge in violation of D.C. public policy. Plaintiff sues defendant Robinson in her individual capacity for intentional interference with the contractual relationship that allegedly existed between plaintiff and the District of Columbia. Plaintiff seeks $50,-000 in compensatory damages for the breach of contract claim, as well as $50,000 in compensatory damages, and $500,000 in punitive damages for each of the remaining four counts, plus costs.

Presently before this Court is defendants' Motion to Dismiss the Complaint for Failure to State a Claim pursuant to Fed.R. Civ.P. 12(b)(6) or, in the alternative, for Summary Judgment pursuant to Fed.R. Civ.P. 56 or, in the alternative, for Judgment on the Pleadings pursuant to Fed.R. Civ.P. 12(c). Both parties submitted exhibits, and plaintiff filed affidavits.

## I. FACTUAL BACKGROUND

Plaintiff served as an attorney for the OCC in the CSS from June 22, 1987, until July 21, 1988. The document that memorializes plaintiff's employment with the District of Columbia specifies that plaintiff's term of employment was to commence

June 22, 1987, and was not to exceed July 21, 1988 (shown on the form as "NTE 7/21/88").[1]

Plaintiff alleges that his problems at CSS stemmed from a dispute that arose during his assignment to the case of *Philpot v. Thomas* ["*Philpot*"]. In October of 1987,[2] Judith Hannah, an OCC attorney, handled the *Philpot* case for the District of Columbia. Ms. Philpot, a resident of Georgia and the former spouse of George Thomas III, a D.C. resident, petitioned the D.C. Superior Court to enforce child support payments for their minor daughter pursuant to the Uniform Reciprocal Enforcement of Support Act. According to plaintiff, Mr. Thomas was an acting budget director of D.C. who maintained a close relationship with Mayor Marion Barry. *See* Plaintiff's Complaint ["Pl.Com."] ¶ 14–16.

During a hearing to resolve the *Philpot* case, Ms. Hannah, of the OCC, refused a settlement of $300.00 in monthly child support payments which was offered by Mr. Thomas' attorney, Leonard Long. *See* Pl. Com. ¶ 17. Ms. Hannah informed Mr. Long that application of Superior Court Child Support Guidelines indicated that monthly child support payments of approximately $1,000.00 would be appropriate. *See* Pl.Com. ¶ 18.

After the hearing, plaintiff contends that Mr. Thomas complained to defendant Cooke who then called defendant Robinson to inquire why the $300.00 settlement offer was not accepted. In response to an inquiry made by defendant Cooke, defendant Robinson personally phoned Ms. Philpot to confirm that she only sought $300.00 and to advise that she might be entitled to more money if she wanted OCC to seek a higher sum. *See* Def.Mem. at 14; Def.Ex. 8, 4.

At defendant Robinson's request, Ms. Philpot submitted a letter that expressly stated that she was aware that an amount greater than $300.00 was available, but that the $300.00 amount was satisfactory. *See* Def.Ex. 4, 8. Subsequently, Ms. Philpot executed an affidavit to the same effect. *See* Def.Ex. 10.

Defendant Robinson then removed Ms. Hannah from the case and assigned it to another OCC attorney, Marsha Browne. *See* Pl.Com. ¶ 19. On the next scheduled hearing date, Mr. Long produced Ms. Philpot's affidavit which evidenced her willingness to accept $300.00 in monthly child support payments.[3] *See* Pl.Com. ¶ 20; Def.Ex. 10. At some point thereafter, defendants assigned plaintiff, Kyle Mulhall, to replace Ms. Browne as counsel for OCC. *See* Pl.Com. ¶ 21.

On November 12, 1987, defendant Robinson instructed plaintiff to "sign off" on the settlement of $300.00. *See* Pl.Com. ¶ 23. Plaintiff believed that, with defendant Robinson's knowledge, Mr. Long had violated Disciplinary Rule 7–101(A)(1) of the Code of Professional Responsibility ["CPR"] by "advis[ing]" Ms. Philpot to sign the affidavit, thereby agreeing to the $300.00 figure. *See* Pl.Com. ¶ 22–23. Plaintiff believed that the proposed settlement "had been engineered through political maneuvering" and "was not in the best interests of the OCC's client, Ms. Philpot...."[4] *See Id.* at ¶ 24. Plaintiff further believed that Mr. Thomas, allegedly a friend of Mayor Marion Barry, used political influence to get defendant Cooke to ensure that the $300.00 figure was accepted. *See* Pl.Com. ¶ 19. Consequently, plaintiff "refused to sign off on the order but indicated to the court that Defendant Robinson had approved the

---

1. *See* Defendants' Memorandum in Support of the Motion for Summary Judgment ["Def. Mem."] at 1; Defendants' exhibit ["Def.Ex."] 1, 2 (compare box 4 with box 10).

2. Paragraph 14 of plaintiff's complaint erroneously dates the initiation of the *Philpot* action as October, 1988.

3. Previously, on March 31, 1987, Ms. Philpot swore under oath that she only sought $300.00. *See* Def.Ex. 3.

4. Plaintiff's notes indicate that he knew the mother [Ms. Philpot] wanted only the amount sought in the order [$300.00] that he had been instructed to sign. The memoranda also show that he was aware of a letter written by the mother to confirm her consent to the $300.00 figure. *See* Def.Mem. at 11 n. 2; Def.Ex. 4, 7.

terms of the settlement." *See Id.;* Def.Ex. 7.

Later that day, defendant Robinson allegedly advised plaintiff that due to his handling of this "political case," she anticipated receiving a complaint from her superior, defendant Cooke. *See* Pl.Com. ¶ 25. Defendants viewed plaintiff's refusal to sign off on the order as an "example of insubordination and poor judgment." *See* Def.Mem. at 19, 2, 11 n. 2.

On November 13, 1987, plaintiff sought advice from the D.C. Office of Bar Counsel concerning Mr. Long's possible violations of the CPR. Plaintiff prepared a formal complaint against Mr. Long (*See* Def.Ex. 5, 6), however he inadvertently failed to mail it. *See* Def.Mem. at 6; Def.Ex. 6. Upon learning of these events, defendant Robinson was upset with plaintiff's decision to contact Bar Counsel without her knowledge. She rebuked plaintiff for contacting Bar Counsel and allegedly remarked that defendant Cooke was "deeply involved" in the "political" nature of the *Philpot* case. *See* Pl.Com. ¶ 27. According to plaintiff, defendant Robinson ordered him to sever all contact with Ms. Philpot and warned that his actions "could have serious consequences." *See Id.* ¶ 27, 29.

Plaintiff further alleges that, after he was removed from the *Philpot* case, defendant Robinson "began to openly humiliate [him]," threatened retaliatory action, and "openly criticized" him on the basis of "insupportable allegations" of shoddy work. *See* Pl.Com. ¶ 30-31. Plaintiff enumerates several instances when defendant Robinson allegedly treated him unfairly.[5] Specifically, plaintiff alleges that when he reported late to work due to illness defendant Robinson docked him two hours sick leave rather than extending to him the customary practice of making up the time by working late; she denied him supervisory assistance by refusing to speak with him during January and February of 1988; plaintiff was "repeatedly denied use of a secretary"; and "plaintiff was also the last attorney to re-

ceive the assistance of a paralegal." *See Id.* ¶ 32-33, 36. Toward the end of February, 1988, defendant Robinson allegedly publicly chastised plaintiff for filing a "Motion for Extension of Time," even though this procedure was frequently used by many OCC divisions. Plaintiff then informed defendant Robinson of his intent to seek other employment. She allegedly responded, "[N]ot with the District government you're not!" *See Id.* ¶ 34-35.

In May of 1988, defendant Robinson gave plaintiff a "satisfactory" evaluation. *See Id.* ¶ 37; Def.Ex. 12. Plaintiff asserts that, contrary to D.C. Personnel Regulations, no one informed him of his right and procedure to appeal this evaluation. *See* Pl.Com. ¶ 39. On June 9, 1988, plaintiff received a dismissal letter written by defendant Robinson informing him that his "TERM appointment" would not be extended. *See* Pl.Com. ¶ 42; Def.Ex. 2. On June 21, 1989, plaintiff commenced this action. Plaintiff asserts that his First and Fourteenth Amendment rights were "chilled" due to his "sincere, professional and conscientious expression to further and effectuate specific processes and procedures within the OCC." *See* Pl.Com. ¶ 46. Plaintiff further asserts that defendants met his efforts with acts of personal retaliation which culminated in his "malicious and wrongful discharge" and "lost specific future employment opportunities with the local government,...." *Id.*

■ Since defendants answered plaintiff's complaint prior to filing their motion to dismiss the complaint for failure to state a claim upon which relief can be granted, under Fed.R.Civ.P. 12(b)(6), this motion is untimely. *See* Fed.R.Civ.P. Rule 12(b), 28 U.S.C.A. (1990) ("A motion making any of these defenses (including "(6) failure to state a claim upon which relief can be granted") shall be made before pleading if a further pleading is permitted.").

Alternatively, defendants request that this matter be treated as a motion for judgment on the pleadings pursuant to

---

**5.** Defendants contend that the incidents detailed by plaintiff are remote incidents unrelated to

the *Philpot* matter.

Fed.R.Civ.P. 12(c). Fed.R.Civ.P. 12(c) states; "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56,...." Since the Court is considering matters beyond the pleadings, defendants' motion will be treated as one for summary judgment pursuant to Fed.R.Civ.P. 56.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). In reviewing a motion for summary judgment the court must consider the pleadings, related documents and evidence in a light most favorable to the non-moving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2510–2511, 91 L.Ed.2d 202 (1986).

Defendants' presentation of the facts differs from plaintiff's. However for purposes of the motion for summary judgment, the facts are construed in a light most favorable to the non-moving party.

## III. FIRST AMENDMENT CLAIM

■ Plaintiff contends that by terminating his position as an attorney with OCC, defendants have penalized him for asserting his First Amendment rights in violation of 42 U.S.C. § 1983. However, defendants did not terminate his position. Plaintiff's employment in the CSS simply ended upon the expiration of his thirteenth month term. Plaintiff either knew or should have been aware that his status was that of a temporary employee whose term expired on July 21, 1988. *See* Def.Ex. 1, 2; Def.Mem. at 1; Def.Rep. at 3 n. 1; Def.Ex. 15, 16. Before plaintiff began working for the OCC, he received a letter which welcomed him and confirmed his appointment as a trial attorney. The letter stated: "This is a TERM Appointment NTE 13 months." *See* Def.Ex. 16. The record does not indicate that plaintiff challenged the temporary nature of his employment status until he filed this lawsuit.

The incident which plaintiff claims precipitated his discharge, i.e., his refusal to "sign off" on his superior's order in the *Philpot* matter, occurred nearly eight months before the time when defendants opted not to renew his term. *See* Pl.Com. ¶ 23, 42; Def.Ex. 2. By allowing plaintiff to continue employment for the duration of the thirteen month agreement, defendants fulfilled any possible contractual obligations they owed to plaintiff.

Moreover, even if plaintiff's position was "terminated," plaintiff's defiance of his former superior's directive was not protected speech within the meaning of the First Amendment. Although plaintiff believed that potential ethical violations and "political maneuvering" surrounded the handling of the *Philpot* case [6], he did not communicate his belief to any third party. Plaintiff's complaint also fails to allege that he communicated the purported "undue influence" exercised by defendant Cooke in *Philpot* to defendant Robinson, Bar Counsel, or anyone else. He contacted the D.C. bar to inquire whether the action of Mr. Thomas' lawyer, Mr. Long, was unethical. However, he did not file a complaint with the D.C. Bar nor voice disapproval of de-

---

6. Plaintiff's sincere belief that defendants did not fully and faithfully represent the interests of Ms. Philpot and her child was unfounded. Ms. Philpot and the state of Georgia requested $300.00 in monthly child support payments. *See* Def.Ex. 3. Defendant Robinson then con-

tacted Ms. Philpot and asked that she send CSS a letter to confirm this request. *See* Def.Ex. 4. Furthermore, plaintiff's records indicate that he was aware of this arrangement. *See* Def.Mem. at 11 n. 2; Def.Ex. 4, 7.

fendants' conduct in the *Philpot* case or the CSS's general operations to any third party. *See* Def.Mem. at 6; Def.Ex. 5, 6.

Plaintiff perceived that an ethical violation occurred when counsel for the father in the *Philpot* case, Mr. Long, contacted the child's mother regarding the child support settlement. However, Mr. Long's action was unrelated to OCC's conduct in the *Philpot* matter. Although plaintiff sought advice from the D.C. Bar Counsel concerning the potential ethical violation, he never filed a formal complaint. When plaintiff informed defendant Robinson about contacting the Bar Counsel, she became irate because plaintiff contacted them without first consulting her. *See* Pl.Com. ¶ 27. Plaintiff argues that this incident was protected speech which culminated in defendant not rehiring him eight months later.

■ Assuming that plaintiff's conduct amounted to "speech" which implicated the First Amendment, he still must satisfy the criteria for maintaining a First Amendment claim that was established in *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988) [hereinafter "Hall"]. *Hall* outlines the four elements of a cause of action that a public employee must satisfy to maintain a suit for a violation of First Amendment rights in the District of Columbia. First, the public employee must have been speaking on a matter of "public concern." *Hall*, 856 F.2d at 258, citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Second, the court must balance the interests of the employee, as a citizen, to comment upon matters of public concern and the interests of the State, as an employer, to promote the efficiency of the public services it performs through its employees. *Id.* at 258, citing *Pickering, supra.* "Third, the employee must prove that his speech was a substantial or motivating factor in the discharge." *Hall*, 856 F.2d at 258, citing *Mount Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Finally, the government employer must have an opportunity to prove that it would have reached the same decision notwithstanding

the protected conduct. *Hall*, 856 F.2d at 258, citing *Mount Healthy, supra.*

The first two inquiries are questions of law for the Court. *Hall*, 856 F.2d at 258; *See, e.g., Connick v. Myers*, 461 U.S. 138, 148 n. 7 & 150 n. 10, 103 S.Ct. 1684, 1690 n. 7 & 1692 n. 10, 75 L.Ed.2d 708 (1983) [hereinafter *"Connick"*]. The last two inquiries are questions of fact for the jury. *Hall*, 856 F.2d at 258.

In this case, plaintiff must satisfy the threshold requirement that his speech touched a matter of "public concern" as defined by *Pickering* and its progeny. Plaintiff Mulhall fails to survive this threshold burden.

In *Pickering, supra*, a high school teacher was dismissed because he openly criticized the Board of Education for its allocation of school funds between athletics and academics and for its method of informing taxpayers about the need for additional revenue. The Court invalidated the dismissal because the speech involved matters of "public concern," i.e., the Board of Education's budget expenditures and how it dispenses information concerning its spending practices to taxpayers.

Unlike the statements made by the teacher in *Pickering*, the terms of a child support settlement agreed upon by Ms. Philpot and Mr. Thomas are not germane to the healthy functioning of a democratic society. Additionally, the information conveyed by plaintiff to Bar Counsel did not allege any potential wrongdoing by public officials. "Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies...." *Barnes v. Small*, 840 F.2d 972, 982–983 (D.C.Cir.1988) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983)). Ms. Philpot, aware that she was possibly entitled to $1,000.00 in monthly child support, freely chose a lesser amount. Plaintiff's personal memoranda reveal that he knew of Ms. Philpot's decision, yet he decided not to facilitate her agreement with

her ex-husband. *See* Def.Mem. at 11 n. 2; Def.Ex. 4, 7.

"Whether an employee's speech address-es a matter of public concern must be determined by the content, form, and con-text of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–148, 103 S.Ct. at 1690. Plaintiff's com-ments about Mr. Long address perceived ethical violations of a private attorney who was retained by a private citizen. The "content" of plaintiff's comments concern-ing attorney Long are unrelated to OCC.

The "form" of plaintiff's "speech" also failed to implicate matters of "public con-cern." Plaintiff did not seek to inform the public about alleged violations of the Code of Professional Responsibility by defen-dants or even Mr. Long. He did not com-municate to anyone his allegations regard-ing "political maneuvering" at OCC, nor did he complain that CSS inadequately rep-resented the District of Columbia. Plain-tiff neglected to attempt to bring to light any potential wrongdoing or breach of the public trust by defendants.

Plaintiff argues that his private conver-sations with defendant Robinson regarding the *Philpot* case were protected speech.[7] *See* Pl.Com. ¶ 27. The complaint fails to specifically allege what was said during these discussions. Although it is unclear, plaintiff apparently alleges that he at-tempted to tell defendant Robinson about the ethical violations that she, defendant Cooke, and Mr. Long were committing. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judg-ment [hereinafter "Pl.Opp."] at 7. How-ever, he never attempted to inform the public of any wrongdoing within the OCC. Following his alleged discussion with de-fendant Robinson, plaintiff did not take any steps to expose any perceived improper conduct. Rather than airing disputes re-garding mismanagement and improper con-duct within the OCC or CSS, plaintiff's complaint revolves around an internal of-fice dispute between him and defendant Robinson regarding her management of the *Philpot* case.

Plaintiff's refusal to "sign off" on the support order stemmed from a lack of con-fidence and trust in his supervisor, defen-dant Robinson. He questioned defendant Robinson's handling of an agreement to which Ms. Philpot consented, notwithstand-ing his knowledge that she understood that she might be entitled to $1,000.00 in month-ly support payments. Almost eight months after the alleged protected speech, plain-tiff's contract was not renewed.

Finally, the "context" of plaintiff's com-munication does not merit First Amend-ment protection. Plaintiff may not mold inter-office disputes into constitutional di-mensions. A substantial segment of the general public would not be interested in the office squabbles between plaintiff and defendant Robinson, and plaintiff's insub-ordination.[8]

Since lawyers are "officers of the Court," plaintiff argues that improper at-torney conduct is a matter of profound "public concern." Plaintiff thought that defendant Robinson knew of Mr. Long's contact with Ms. Philpot. *See* Pl.Com. ¶ 22–23. While the contact made by Mr. Long with Ms. Philpot might have been unethical, it was unrelated to the services performed by defendants. Mr. Long's ac-tions may not be imputed to defendant Robinson. Plaintiff's refusal to "sign off" on the settlement was an act of insubor-dination, not an issue of "public concern."

---

7. Private conversations may be protected by the First Amendment. *See Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–416, 99 S.Ct. 693, 696–697, 58 L.Ed.2d 619 (1979). However, the circumstances under which the speech was made impacts the right of plaintiff to receive First Amendment protection for that speech. *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8.

8. Plaintiff's insubordinate action was unrelated to "an area as to which there is room for princi-pled disagreement on goals or their implemen-tation." *Hall*, 856 F.2d at 264. Plaintiff's refus-al to sign off on the child support order agreed upon by Ms. Philpot and Mr. Thomas did not implicate any policy area of the OCC. If the OCC had used political pressure to manipulate Ms. Philpot into signing the agreement, this would be a different case.

Since plaintiff is unable to show that the speech touches a matter of "public concern," it is unnecessary for this Court to scrutinize the reasons for his non-renewal. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689 (footnote omitted). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. at 1690.

Contrary to plaintiff's allegation, defendants' decision not to extend his temporary employee status did not "chill" his free speech rights. "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Id.* at 145, 103 S.Ct. at 1689. (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). Plaintiff sought to carry out his personal agenda, not to promote any interchange of ideas which might cause political or social change. Plaintiff's refusal to comply with his superior's direction to "sign off" on the order impeded the facilitation of an agreement entered between two parents concerning support payments for their child. As such, it was an act of insubordination unshielded by the First Amendment.

Even if plaintiff's "speech" could be construed as reaching a "public concern" within the meaning of the First Amendment, CSS's interest in the efficient administration of its public duties outweighs plaintiff's interest to engage in the type of "speech" he alleges. Justice Brennan hypothesized a scenario similar to the present case and concluded: "Perhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering 'No' to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is 'speech' ..., it is also insubordination [which] may serve as the basis for a lawful dismissal." *Connick* at 163 n. 3, 103 S.Ct. at 1687 n. 3 (Brennan,

J., dissenting). Plaintiff's obstinacy disrupted CSS in its efficient administration of child support matters for the D.C. government.

This Court is an inappropriate forum to re-examine defendants' decision not to renew plaintiff's employment term.

Even where a public employee's speech does not touch upon a matter of public concern, that speech is not "totally beyond the protection of the First Amendment," but "absent the most unusual circumstances a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

*Rankin v. MacPherson*, 483 U.S. 378, 384 n. 7, 107 S.Ct. 2891, 2897 n. 7, 97 L.Ed.2d 315 (1987) (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690).

In *Connick*, the Court applied the *Pickering* balancing test to an Assistant District Attorney who was fired by the State for distributing a questionnaire that primarily concerned the affairs of the office. Although one question asked whether employees felt pressured to work on political campaigns, the Supreme Court held that this was insufficient to tip the balance in favor of the fired employee. The Court found that the First Amendment did not protect the speech. It upheld the supervisor's decision to fire the employee and dismissed Ms. Connick's 42 U.S.C. § 1983 claim.

In the *Pickering* balance, "[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise." *Rankin*, 107 S.Ct. at 2899. As an employer, CSS has a strong interest to promote the efficiency of the services it performs by insuring that employees respect and heed decisions properly made by office superiors. CSS can not effectively carry out its responsibilities if it must endure disobedience and second guessing by an employee of the reasonable decisions made by his superior. Plaintiff's refusal to "sign off" on the order "has a detrimental impact on close working rela-

tionships for which personal loyalty and confidence are necessary, [it] impedes the performance of [plaintiff's] duties[, and it] interferes with the regular operation of the enterprise." *Id.*

On balance, CSS's interest to maintain smooth office operations outweighs the concern of the employee, as a citizen, to comment on matters of insignificant public concern. As the Court stated in *Connick,* there is a "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick,* 461 U.S. at 143, 103 S.Ct. at 1688 (footnote omitted).

A temporary public employee who disobeys his superior's lawful command to "sign off" on a child support order which was agreed upon by the child's parents, and whose employment term is not extended after its expiration, does not state a claim based on the infringement of First Amendment rights. As a matter of law, plaintiff did not speak on a matter of "public concern." Nor does plaintiff's refusal to "sign off" on the child support order outweigh the government's interest, as an employer, to promote the efficiency of the public services it performs through its employees. Plaintiff's failure to satisfy the first two requirements of the *Hall* analysis, makes it unnecessary for this Court to address the remaining two queries. Summary judgment is granted to defendants on the 42 U.S.C. § 1983 cause of action based on the alleged violation of free speech rights guaranteed by the First Amendment.

**IV. DUE PROCESS**

■ Plaintiff claims that the OCC's decision not to renew his contract deprived him of a "property" interest in continued employment in violation of his due process rights within the meaning of the Fourteenth Amendment. To prevail on this claim, plaintiff must establish that he held a "legitimate expectation" of continued employment in the OCC by means of "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain bene-

fits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) [hereinafter *"Roth "*]; *Hall v. Ford,* 856 F.2d at 265.

Plaintiff's thirteen month term lapsed and defendants chose not to extend his employment. His allegations parallel those advanced by the university professor in *Roth.* In *Roth,* the Court held that a teacher employed by the State lacked a "property" interest in continued employment when his term expired on a certain date and no provision was made to renew his contract. *Roth,* 408 U.S. at 577–578, 92 S.Ct. at 2709. Professor Roth could not point to any rules or understandings to support his contention that a "property" right had inured to him. Likewise, plaintiff Mulhall can not cite any rule or understanding to establish a legitimate expectation in continued employment.

■ Plaintiff's status as an "excepted service" employee pursuant to D.C.Code Ann. § 1–610.2 (1981), does not create a constitutionally secured "property" right. Under D.C. law, "excepted service" employees are not afforded any job tenure or protection. *Hall,* 856 F.2d at 265; D.C. Code Ann. § 1–610.5 (1981). Plaintiff attempts to buttress his claim by citing a statute which gives D.C. employees a "right to freely express their opinions on all public issues." D.C.Code Ann. § 1–616.2(1) (1981). Notwithstanding the dubious nature of the "public issue" upon which plaintiff spoke, the D.C. Circuit has rejected the argument that this "modest restriction" may give an employee a legitimate claim of entitlement to continued employment. *Hall,* 856 F.2d at 266.

Plaintiff claims that since he had a "special appointment" pursuant to D.C.Code § 1–610.4(4) (1981), defendants could only discharge him for "cause." However, his personnel forms clearly demonstrate that he was appointed pursuant to D.C.Code § 1–610.9 (1981), which is entitled "Appointment of Attorneys." *See* Def.Ex. 1. Even if plaintiff held a "special category position" pursuant to District of Columbia Register § 904.4(b) [hereinafter "DCR"]

April 26, 1985,[9] he is not entitled to any greater due process than what he received. The D.C. regulations which establish the rights of employees in "special category" positions do not mention, as plaintiff alleges, that such employees may only be discharged for "cause." *See* DCR § 908.4, Def.Ex. 14.

■ A "special category" employee who "completed at least one year of service . . . with average performance, . . . shall be entitled to advance written notice of at least fifteen days when termination is contemplated, explaining the reason for the termination." DCR § 908.4. Defendants gave plaintiff timely notice that his "TERM appointment" would not be extended. *See* Def.Ex. 2. Furthermore, pursuant to DCR § 908.5, since plaintiff's personnel action form contained a not-to-exceed date of July 21, 1988, he was not entitled to fifteen days notice.[10] *See* Def.Ex. 1, boxes 10, 36 and 37.

Plaintiff also asserts that he was "unable to appeal his satisfactory job rating due to [a] failure to follow evaluation procedures in the D.C. Personnel Regulations." *See* Pl.Com. ¶ 56. District of Columbia Register § 1–615.4 states that an agency head "may provide" an employee with an impartial review of the performance rating only upon the written request of an employee of that agency. Plaintiff fails to allege that he made the written request which is a prerequisite to an "impartial review." Moreover, a review is left to the discretion of the agency head. It is not guaranteed to every employee who is upset with a performance rating.

No D.C. law, OCC rule or policy, confers plaintiff with a "property" interest within the Fourteenth Amendment. Additionally, plaintiff fails to show that any understanding reached between him and defendants furnished him with a legitimate expectation of continued employment. OCC's personnel action Form 1 listed plaintiff as a temporary employee whose term was not to exceed thirteen months. *See* Def.Ex. 1. Plaintiff never received any clear assurance from defendants which provided for an extension of the contract or one which guaranteed renewal absent discharge for "cause." The communications between the parties could not have led plaintiff to legitimately expect a "property" interest in continued employment. Plaintiff can not cite any OCC materials which would have induced him to legitimately expect to be rehired.

The complaint alleges that plaintiff's "contractual expectation of continued professional employment as an attorney" was a "specific reason" which initially motivated him to work for OCC. In his complaint, plaintiff also characterized this position as a "stepping stone" to future employment opportunities with the District of Columbia. *See* Pl.Com. ¶ 12–13. However, this vague unilateral expectancy of continued employment does not create a "property" interest protected by procedural due process. *See Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ Plaintiff contends that his legitimate expectation of continued employment stemmed from a satisfactory performance rating and oral representations made to him by defendant Robinson. This contention lacks merit. "It is well settled District of Columbia law that in the absence of clearly expressed contrary intent, 'the assumption will be that-even though [the parties] speak in terms of "permanent" employment-the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party.'" *Minihan v. American Pharmaceutical Ass's*, 812 F.2d 726, 727 (D.C.Cir.1987), quoting *Littell v. Evening Star Newspaper Co.*, 120 F.2d 36, 37 (D.C. Cir.1941).

■ Plaintiff's status as an "excepted service" employee presumptively makes him an at will employee, *Hall*, 856 F.2d at 265, whose employment with OCC was ter-

---

**9.** *See* Def.Ex. 13.

**10.** "The fifteen-day notice shall not be required for termination on the date previously anticipat-

ed for termination, such as in the case of an employee with a not-to-exceed (NTE) date. . . ." DCR § 908.5, Def.Ex. 14.

minable at will.[11] Plaintiff lacked any "property" interest because an objective basis upon which to believe that he would continue to be employed indefinitely by OCC was absent.

After the completion of his first term of employment, which was set at thirteen months, plaintiff's term was simply not extended. As in *Roth*, where the plaintiff was a faculty member who lacked tenure and whose one-year contract was not renewed following his first year, plaintiff has no legitimate expectation of continued employment. No constitutional property interest derives from plaintiff's thirteen month stint at the OCC.

Plaintiff harbored an abstract and unilateral notion of being rehired, not a "property" interest sufficient for this Court to require OCC to renew his term of employment. Summary judgment is granted to defendants on the due process claim.

## V. PENDENT CLAIMS

 Under Article III of the United States Constitution, a federal district court may only hear cases which involve diversity of citizenship or federal questions. If a plaintiff's pleadings contain a substantial federal claim, a federal court is empowered to hear pendent state claims which "derive from a common nucleus of operative fact" and are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The exercise of jurisdiction over these state law claims is known as pendent jurisdiction. *See* 13B Wright & Miller, Federal Practice and Procedure § 3567.1 (1984). "[P]endent jurisdiction is an exercise of discretion, not of plaintiff's right." *Id.*

Counts III through V of plaintiff's complaint allege common law torts of breach of contract, wrongful discharge in violation of public policy, and intentional interference with contractual relations. Because summary judgment is granted to defendants on plaintiff's federal claims, this Court in the exercise of its discretion declines to exercise pendent jurisdiction over these related claims which are based on state law. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

As the *Gibbs* Court reasoned:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Id.*

An appropriate order accompanies this opinion.

## ORDER

Upon consideration of Defendants' Motion for Summary Judgment, the plaintiff's opposition thereto after hearing oral arguments, and in accordance with the Court's opinion of this date, it is hereby

ORDERED that Defendants' Motion for Summary Judgment be and hereby is GRANTED as to Counts 1 & 2 of plaintiff's complaint; and it is

FURTHER ORDERED that Counts 3 through 5 of plaintiff's complaint are dismissed without prejudice because the Court declines to accept jurisdiction of state derived claims under its pendent jurisdiction authority.

---

11. The publication of frequent statements by an employer which "corroborate terms of lifetime employment," compliance by an employee with personnel guidelines, and several assurances by supervisors and a superior that an employee's job was not "in jeopardy" have been held insufficient to rebut the presumption of an at will employment arrangement. *Fleming v. AT & T Information Services, Inc.*, 878 F.2d 1472, 1474–1475 (D.C.Cir.1989).